**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael D. PIRELLO, Defendant–**
**Appellant.**

**No. 00–30232.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 2001

Filed June 20, 2001

---

Judy Clarke (Briefed), Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the defendant-appellant.

Brent A. Hart (Argued), Federal Defenders of Eastern Washington and Idaho, Spokane, Washington, for the defendant-appellant.

Thomas O. Rice (Briefed), U.S. Attorney's Office, Spokane, Washington, for the plaintiff-appellee.

Rolf H. Tangvald (Argued), U.S. Attorney's Office, Spokane, Washington, for the plaintiff-appellee.

Before: FARRIS, TROTT, and BERZON, Circuit Judges.

Opinion by Judge TROTT: Dissent by Judge BERZON

TROTT, Circuit Judge:

This appeal arises from the sentence imposed on defendant-appellant, Michael D. Pirello, who pled guilty to using the Internet to commit wire fraud in violation of 18 U.S.C. § 1343. The district court applied a two-level enhancement to Pirello's base offense level under United States Sentencing Guidelines § 2F1.1(b)(3) ("U.S.S.G. § 2F1.1(b)(3)") for using mass-marketing to effectuate his crime. Pirello challenges the applicability of U.S.S.G. § 2F1.1(b)(3) to his case. We have jurisdiction pursuant to 28 U.S.C. § 1291, and AFFIRM the sentence imposed by the district court.

## I

### Background

The Internet engenders a medium of communication that enables information to be quickly, conveniently, and inexpensively disseminated to hundreds of millions of individuals worldwide. *See Reno v. ACLU*, 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (stating that an estimated 200 million people were expected to use the Internet in 1999). This quality makes the Internet a well-known and valuable tool for businesses and individuals seeking to advertise their goods to a large number of people. *See, e.g.,* Michael Korybut, *Online Auctions of Repossessed Collateral Under Article 9,* 31 RUTGERS L.J. 29, 54 n. 114 (1999) ("By targeting the specific market segment and continuous delivery over the Internet, online advertising can efficiently reach the appropriate audience, in sharp contrast to traditional mass marketing where the target audience is constantly exposed to advertisements in which they have no interest."). Unfortunately, however, the power to solicit money instantly and inexpensively from hundreds of millions of people though Internet advertising pres-

ents a double-edged sword. The same characteristics that make the Internet a valuable tool in today's commerce—i.e., the ability to effectively and efficiently reach a large audience of prospective buyers—also make it a seductive playground for unscrupulous individuals bent on defrauding innocent victims. The facts before us clearly illustrate this point.

During the Fall of 1999, Pirello placed four separate advertisements on an Internet classified-ads website, each soliciting buyers for a different type of computer. The website, known as *Excite Classifieds*, allows individuals to post classified-ads that can be readily accessed by the general public. *See* http://classifieds.excite.com/. The advertisements posted by Pirello were part of a fraudulent scheme whereby Pirello would induce prospective buyers to send him money for computers he never intended to deliver.

Pirello took great care in ensuring that his fraudulent Internet advertisements would appear legitimate to even the most cautious of prospective buyers. To accomplish this end, Pirello composed lengthy advertisements describing the nonexistent computers in great detail, including the computers' operating systems, monitors, memory capacities, modems, weights, processors, and much more. The advertisements additionally included shipping terms, acceptable forms of payment, information about Pirello, his reasons for selling the computers, and the location of the computers. One of the four advertisements used by Pirello reads as follows:

| | |
|---|---|
| PC Notebook | Dell latitude CPi R, $2,500/ OBO, Used |
| Processor | Pentium II |
| Memory | 128 MB |
| Hard Disk | 6.40 GB |
| Screen | 14.1″—Active Matrix |
| Video RAM | 4.00 MB |
| Operating System | Windows NT 4.0 |
| Modem | 56 Kbps |
| CD–ROM | 24X |
| DVD–ROM | None |
| Battery | Lithium Ion |
| Weight | 6 lbs. |
| PCMCIA Slots | 2 |
| Warranty | 3 years |
| Options | Color Display Infrared Stereo Speakers Floppy Disk Drive Docking Station |
| Description | this is just like new. family death forces sale of my laptop. i have extra battery and leather case. will take all offers into consideration. need to sell asap. |
| Shipping | • Item is located in: Couer D' Alene, ID 83814 • Seller pays shipping |
| Sales Policy | Accepts: • Money order or cashier's check • Personal checks |

Between October and December of 1999, three individuals responded to Pirello's fraudulent Internet advertisements. Pirello negotiated the sale of a computer to each of the three individuals, assuring them that the computers would be delivered upon his receipt of their payments. Pirello received over $4,000 in checks for the nonexistent computers, which he deposited into his personal bank account. When Pirello's victims did not receive their computers as promised, they immediately contacted the FBI. Pirello admitted to the FBI that he had received several large checks from various individuals, but professed ignorance as to why he had been sent the money.

On February 8, 2000, Pirello was charged in a superseding indictment with three counts of wire fraud and three counts of mail fraud. On March 30, 2000, pursuant to a written plea agreement, Pirello pled guilty to three counts of wire fraud in violation of 18 U.S.C. § 1343. At sentencing, over the objection of Pirello,

the district court increased Pirello's sentence by two levels based on the "mass-marketing" enhancement under U.S.S.G. § 2F1.1(b)(3). The district court explained that this enhancement was appropriate given that Pirello's use of the Internet allowed for "the broadest possible solicitation" from "a world-wide audience." Pirello appeals this holding by the district court.

## II

### Standard of Review

We review de novo the district court's interpretation of the Sentencing Guidelines. *United States v. Kakatin,* 214 F.3d 1049, 1051 (9th Cir.2000). The district court's factual findings in the sentencing phase are reviewed for clear error. *United States v. Maldonado,* 215 F.3d 1046, 1050 (9th Cir.2000). The district court's application of the facts of a particular case is reviewed for an abuse of discretion. *United States v. Leon–Reyes,* 177 F.3d 816, 824 (9th Cir.1999).

## III

### Analysis

■ The interpretation of U.S.S.G. § 2F1.1(b)(3) presents us with a novel issue. The only circuit to interpret this guideline limited its analysis to the narrow question of whether U.S.S.G. § 2F1.1(b)(3) retroactively applied to a telemarketing scheme conducted prior to the promulgation of the guideline. *See United States v. Coe,* 220 F.3d 573, 578–79 (7th Cir.2000). To date, no court has spoken on the applicability of U.S.S.G. § 2F1.1(b)(3) to cases involving the use of Internet advertisements to effectuate a fraudulent scheme. We therefore must rely upon (1) the relevant application note as our compass, and (2) logic as our guide in navigating this uncharted territory.

■ United States Sentencing Commission, Guidelines Manual, § 2F1.1(b)(3), instructs district courts to enhance a defendant's sentence by two levels "[i]f the offense was committed through mass-marketing...." U.S.S.G. § 2F1.1(b)(3). The applicable application note defines "mass-marketing" as follows:

> "Mass-marketing," as used in subsection (b)(3), means a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, *the Internet,* or other means to induce a large number of persons to (A) purchase goods or services....

U.S.S.G. § 2F1.1, cmt. n. 3 (1998) (emphasis added). We are bound by the interpretative commentary of the Sentencing Guidelines unless it violates the Constitution, a federal statute, or is inconsistent with the guideline itself. *See Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *United States v. Robinson,* 94 F.3d 1325, 1328 (9th Cir.1996).

The application note to U.S.S.G. § 2F1.1(b)(3) forecloses any argument by Pirello that his actions did not constitute "mass-marketing" under U.S.S.G. § 2F1.1(b)(3). The fact that Pirello posted several advertisements on a classified-ads website demonstrates that his scheme was not an isolated event, but rather a fraudulent "plan, program, promotion, or campaign." U.S.S.G. § 2F1.1, cmt. n. 3. Furthermore, by placing a classified ad on the Internet, Pirello was able to solicit funds instantaneously and continuously from over 200 million individuals worldwide. *See Reno,* 521 U.S. at 849, 117 S.Ct. 2329. Such conduct clearly constitutes "solicitation by ... the Internet ... to induce a large number of persons to [] purchase goods." Thus, under the plain language of the interpretative commentary to U.S.S.G.

§ 2F1.1(b)(3), Pirello's actions qualify as mass-marketing.

Pirello argues that his fraudulent advertisements do not qualify as "mass-marketing" because he did not operate a scheme "to induce a *large number* of persons to [] purchase goods...." U.S.S.G. § 2F1.1, cmt. n. 3 (emphasis added). In an unpersuasive attempt to support this argument, Pirello notes that only three people responded to his advertisements. As noted by the district court, Pirello's advertisement invited *any* and *all* persons to send money for computers that Pirello had no intention of providing. Pirello presents no evidence demonstrating that he ever refused to accept money from a willing buyer or that he would have done so had the opportunity arisen. The relatively low number of individuals actually victimized by Pirello before the FBI ended his scheme was the product of chance, and is in no way indicative of the breadth of Pirello's solicitation. Had hundreds of computer seekers responded, they, too, would have fallen victim to his plan.

Additionally, Pirello contends that a classified ad does not constitute "mass-marketing" because the concept requires "the potential purchaser to seek the purchase." Mass-marketing in the context of Internet use, Pirello maintains, occurs only where the seller "actively solicits [a] large number of purchasers by" circulating a "mass e-mail to a purchased list of e-mail addresses." Pirello argues essentially that a swindler must hunt his victims with a shotgun rather than with a trap to invoke U.S.S.G. § 2F1.1(b)(3). We reject this argument.

Pirello's interpretation of U.S.S.G. § 2F1.1(b)(3) does not find support in the language of the statute, its application note, or case law. The fact that Pirello used the form of a classified ad rather than a mass e-mail to entice people to send him money does not alter the fact that Pirello used the "Internet ... to induce a large number of people to [] purchase goods." U.S.S.G. § 2F1.1, cmt. n. 3. In fact, Pirello's use of what appeared to be a classified ad arguably enabled him to solicit more people in a much more efficient manner than would have been possible with a mass e-mail. For instance, while a mass e-mail is sent to and viewed by a finite number of people, there is no commensurate limitation on the number of people who can be exposed to an advertisement on a general access website. Furthermore, unlike some mass e-mails that are sent to a random cross-section of the public, classified-ads are frequented by individuals predisposed to make a particular purchase, thereby making classified-ads a much more efficient means of effectuating fraud. Therefore, Pirello's actions represent the precise type of conduct contemplated by U.S.S.G. § 2F1.1(b)(3).

## IV

### Conclusion

For the foregoing reasons, we conclude that Pirello's use of a general access Internet classified ads website to solicit money for nonexistent computers constitutes the use of "the Internet ... to induce a large number of persons to [] purchase goods." U.S.S.G. § 2F1.1, cmt. n. 3. Accordingly, we AFFIRM the district court's enhancement of Pirello's sentence pursuant to U.S.S.G. § 2F1.1(b)(3).

BERZON, Circuit Judge, dissenting:

I agree with the majority that Pirello's scheme was not an isolated event but a "plan" or "scheme," and that his advertisements reached a great many people. So the definition contained in the pertinent Guidelines Application Note, U.S.S.G.

§ 2F1.1(b)(3), cmt. n. 3 (1998) is satisfied in some respects.

I nonetheless dissent, because Pirello's conduct did not in another, key respect come within the Application Note definition. Pirello simply placed his advertisements on an Internet website devoted to such advertisements. Such passive placement, to my mind, does not constitute "*solicitation* by . . . the Internet." "Solicitation" usually denotes more than simply advertising for funds, sales, or signatures. Instead, the term suggests some sort of one-on-one importuning.

The dictionary definition of the term is "the action of soliciting, or seeking to obtain *by earnest request* . . . ." OXFORD ENGLISH DICTIONARY 967 (2d ed. 1989). The use of the word in legal discourse is similar. *See, e.g., United States v. Kokinda,* 497 U.S. 720, 725, 731, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990); *id.* at 733, 110 S.Ct. 3115 ("Since the act of soliciting alms or contributions usually has as its objective an immediate act of charity, it has the potentiality for evoking highly personal and subjective reactions. Reflection usually is not encouraged, and the person solicited often must make a hasty decision whether to share his resources with an unfamiliar organization while under the eager gaze of the solicitor.") (*quoting* 43 Fed. Reg. 38824).

It is apparent that the Application Note uses the term "solicitation" in this sense. Aside from solicitation by the Internet, the other two specific types of solicitation mentioned in the Note are "solicitation by telephone [or] mail." Both of the latter refer to communications that are directed at specific individuals in person, rather than advertisements passively made available to all. The more specific example spelled out in the Note is also of this ilk: "The enhancement would apply, for example, if the defendant conducted or participated in a telemarketing campaign that solicited a large number of individuals to purchase fraudulent life insurance policies."

It is noteworthy, as well, that the Guidelines' definition does *not* mention some very common modes of advertising, such as advertising on television, in newspapers and magazines, or on billboards. Those media can reach very large numbers of people, but do not involve the personal approach which is more difficult to refuse, *see Kokinda,* 497 U.S. at 734, 110 S.Ct. 3115, and therefore more likely to result in harm if there is fraud involved in the offer of sale. An advertisement in the New York Times, for example, reaches hundreds of thousands of people, and can offer specific items for sale at a specific price; a television "infomercial" can reach millions. Yet it would be unusual to refer to such an advertisement—including a classified advertisement or an "infomercial"—as a "solicitation."

Had it been intended that "mass marketing" would encompass *all* advertisements offering an item for sale and reaching large numbers of people, one would have expected that the Application Note would say that, rather than indicating a more limited intent. By what it does *not* mention, then, as well as by what it does, the Note definition suggests that the enhancement does not include *any* form of advertisement or media for advertising, but only direct approaches to large numbers of targeted persons.

Two traditional principles of statutory interpretation, *noscitur a sociis* and *ejusdem generis* support this result. "The first means that a word is understood by the associated words, the second, that a general term following more specific terms means that the things embraced in the general term are of the same kind as those denoted by the specific terms." *United*

*States v. Lacy,* 119 F.3d 742, 748 (9th Cir.1997); *see also Sutton v. Providence St. Joseph Medical Center,* 192 F.3d 826, 834 (9th Cir.1999) ("When a statute contains a list of specific items and a general item, we usually deem the general item to be of the same category or class as the more specifically enumerated items."). Here, the examples given are a subset of all possible ways in which sellers reach potential buyers, suggesting a meaning for the term in question, "solicitation by ... Internet," that draws from the characteristics of only that subset of advertising methods.

If newspaper classified ads and television or radio "infomercials" are not "solicitation by ... other means," I am at a loss to understand why digital classified ads are "solicitation by ... Internet." Instead, I would understand that term to include only the kind of personal—albeit electronic—direct approach that is available through Internet-accessed e-mail sites (Yahoo, HotMail, and so on) and other new forms of targeted, affirmative-approach marketing on the Internet. Accordingly, I respectfully dissent.