**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

STEVEN WILLIAM SUTCLIFFE,
*Defendant-Appellant.*

No. 04-50189

D.C. No.
CR-02-00350-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
February 7, 2007—Pasadena, California

Filed October 11, 2007

Before: Monroe G. McKay,* Alex Kozinski, and
Stephen S. Trott, Circuit Judges.

Opinion by Judge McKay

*The Honorable Monroe G. McKay, Senior United States Circuit Judge
for the Tenth Circuit, sitting by designation.

13731

**COUNSEL**

Sung B. Park, Van Nuys, California, for the defendant-appellant.

Debra Wong Yang, Thomas P. O'Brien, and Elena J. Duarte (argued), United States Attorney's Office, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

McKAY, Circuit Judge:

Following a three-week jury trial, Defendant was convicted of three counts of making interstate threats to injure in violation of 18 U.S.C. § 875(c) and five counts of transferring

social security numbers with the intent to aid and abet unlawful activity in violation of 18 U.S.C. § 1028(a)(7). He raises numerous issues on appeal.

## BACKGROUND

Defendant, a computer technician, was hired by Global Crossing Development Company in August 2001. Shortly thereafter, however, his employment was terminated because he refused to provide the Human Resources Department with his social security number, Global Crossing discovered that he had failed to disclose past criminal convictions on his job application, and he threatened the director of Human Resources. After his termination, Defendant began picketing outside the Global Crossing building with a sign referring to a website he had created. On this website, Defendant displayed Global Crossing employees' personal information, including payroll information, social security numbers, birth dates, and residential addresses, with some of this information hyperlinked to an article about identity theft.

When Global Crossing's manager of policy enforcement was informed of the website, he began periodically archiving copies of the website. These copies were turned over to the FBI, which also archived screen-shots of the website on three occasions. As they visited the website, Global Crossing officials and the FBI saw increasing amounts of personal information posted online. Specifically, the number of Global Crossing employees whose social security numbers were displayed online increased from approximately fifteen on October 24, 2001, to well over a thousand on December 3, 2001.

Global Crossing obtained a temporary restraining order against Defendant in October 2001. A process server drove to Defendant's California residence to serve the order on him in a vehicle bearing South Dakota license plates. As she was leaving his residence after serving the papers on him, she observed Defendant writing something on a piece of paper.

That night, she saw that her name and the vehicle's license plate number had been posted on the website. During subsequent visits to the website, she read several statements addressed to her. On October 24, 2001, one week after she served the order on Defendant, a page on the website stated:

> Do you really think I am just some computer geek? You are not even close!
>
> If you don't like seeing your license plate on this website, here is some advice next time you attempt to stake-out my home, get a rental-car! . . .
>
> By the way, I was planning on taking a trip to South Dakota real soon to visit Mt. Rushmore, maybe we can "hook-up." Then maybe we could talk about this sudden rage and anger you have about seeing your license plate number published on this site? You think seeing that number is bad . . . trust us when we say [it] can get much, much, worse.
>
> To close, [Process Server], if you call this house again and threaten me, or my family, or ever appear near me, or my family, I will personally send you back to the hell from where you came.

(E.R. at 92).[1]

On January 31, 2002, a page on the website read:

> [Process Server], have you ever been stabbed with a knife? I have. A real big one, punctured my lung. . . . Anyhow, the reason I am telling you this is to let you know I understand you were just doing your job, just like I was just trying to do my job. Just as that

---

[1]Citation to "E.R." refers to Defendant's Excerpts of Record. Citation to "G.E.R." refers to the Government's Excerpts of Record.

man was doing his job, which at the time was to try to kill me. As I forgave him, I can forgive you. This does not mean however I want to see or meet this man again.

I really don't take kindly to people threatening me or lying to the courts that they served me with a T.R.O. . . .

Our paths are now crossed and we are forever joined . . . to deal with that I am going to make you a one time offer. If I never see or hear from or of you again, I will forget you . . . . However, if I do ever hear your name mentioned against me ever again I will personally add you to my domain list. I think you understand the issues now enough to understand what this means. If I ever see you near my family again, and I know how to stalk too, I will kill you. That's my offer.

Now, go in the peace and lie about me no more."

(G.E.R. at 495.)

Defendant also used the website to express his dissatisfaction with Global Crossing's former assistant general counsel. On March 17, 2002, the website included a page stating that it was "Dead-icated" to this attorney. (E.R. at 100.) This page was accompanied by a sound file of frightening music and a voice stating: "Welcome to my domain. This is all far from over." (E.R. at 100; G.E.R. at 295.) A link on this page led to a page displaying personal information about the attorney, including her home address, home phone number, social security number, signature, and date of birth. This page was linked to a detailed map showing the location of her home. Another link on the page opened a file displaying a photograph of her with her young daughter, while a voiceover stated: "I can outrun you. I can outthink you. I can outphiloso-

phize you, and I'm going to outlast you." (G.E.R. at 301.) The voiceover came from *Cape Fear*, a film in which an ex-convict stalks and attempts to kill an attorney and his daughter.

Another individual specifically targeted on the website was the then-chairman of Global Crossing. Defendant posted the chairman's personal information, including his social security number and home address, on the website in February 2002. Defendant also posted a message telling him, "Keep your dogs @ bay . . . I'm now armed." (E.R. at 94.)

Defendant was arrested and indicted on four counts of transmitting in interstate commerce threats to injure, in violation of 18 U.S.C. § 875(c), and five counts of transferring social security numbers with intent to aid and abet the false use of a social security number, in violation of 18 U.S.C. § 1028(a)(7). After a three-week trial, the jury found Defendant guilty on all but one count of the indictment.[2] The court sentenced Defendant to a forty-six-month term of imprisonment, at the top of the applicable Sentencing Guidelines range, and a three-year term of supervised release. Having served his forty-six-month sentence, Defendant is now on supervised release. He appeals numerous aspects of his prosecution, trial, and sentence.

## DISCUSSION

### A.   Jurisdiction

Defendant argues that the district court lacked subject matter jurisdiction because there is no evidence that the charged offenses had the required nexus to interstate commerce. Because the jurisdictional question here is intertwined with the merits, we consider "whether, viewing the evidence in the

---

[2]Defendant was found not guilty of threatening Global Crossing's chairman.

light most favorable to the prosecution, any rational trier of fact could have found that the government proved a sufficient connection to interstate commerce beyond a reasonable doubt." *United States v. Morgan*, 238 F.3d 1180, 1185-86 (9th Cir. 2001).

**[1]** "The Internet is an international network of interconnected computers," *Reno v. ACLU*, 521 U.S. 844, 849 (1997), similar to—and often using—our national network of telephone lines, *see Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). We have previously agreed that "[i]t can not be questioned that the nation's vast network of telephone lines constitutes interstate commerce," *United States v. Holder*, 302 F. Supp. 296, 298 (D. Mont. 1969), *aff'd and adopted*, 427 F.2d 715 (9th Cir. 1970) (per curiam), and, a fortiori, it seems clear that use of the internet is intimately related to interstate commerce. As we have noted, "[t]he Internet engenders a medium of communication that enables information to be quickly, conveniently, and inexpensively disseminated to hundreds of millions of individuals worldwide." *United States v. Pirello*, 255 F.3d 728, 729 (9th Cir. 2001). It is "comparable . . . to both a vast library including millions of readily available and indexed publications and a sprawling mall offering goods and services," *ACLU*, 521 U.S. at 853, and is "a valuable tool in today's commerce," *Pirello*, 255 F.3d at 730. We are therefore in agreement with the Eighth Circuit's conclusion that "[a]s both the means to engage in commerce and the method by which transactions occur, 'the Internet is an instrumentality and channel of interstate commerce.' " *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (per curiam) (quoting *United States v. MacEwan*, 445 F.3d 237, 245 (3d Cir. 2006)); *see also United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004) ("Congress clearly has the power to regulate the internet, as it does other instrumentalities and channels of interstate commerce . . . .").

**[2]** Here, the government introduced evidence that Defendant was living in California at the time the website was first

established and that in November 2001 he moved to New Hampshire, where he continued to post threats and social security numbers on the website. The government also presented evidence that, during the relevant time period, the website was uploaded to various servers located in Louisiana, North Carolina, and Virginia. Taken in the light most favorable to the prosecution, this evidence supports the conclusion that Defendant electronically sent threats and social security numbers to internet servers located across state lines. We hold that this interstate transfer of information by means of the internet satisfies the jurisdictional elements of the statutes under which Defendant was convicted. *See* 18 U.S.C. § 1028(c)(3) (2000) (providing that the prohibited production, transfer, possession, or use must be "in or affect[ing] interstate commerce"); *id.* § 875(c) (prohibiting transmission "in interstate or foreign commerce" of any communication containing a threat to kidnap or injure); *see also United States v. Kammersell*, 196 F.3d 1137, 1138-39 (10th Cir. 1999) (holding that threat sent by instant message over interstate telephone lines "falls within the literal scope of [§ 875(c)] and gives rise to federal jurisdiction").

## B.   Constitutionality of § 875(c)

Defendant next argues that § 875(c) is unconstitutionally vague. We review this contention de novo, *United States v. Cooper*, 173 F.3d 1192, 1202 (9th Cir. 1999), applying a presumption of constitutionality to the challenged statute, *Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000). To survive vagueness review, a statute must "(1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner." *Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997).

**[3]** A conviction under § 875(c) requires the specific intent to threaten, *United States v. Twine*, 853 F.2d 676, 680 (9th

Cir. 1988), and only true threats may be prohibited, *see Virginia v. Black*, 538 U.S. 343, 359-60 (2003). Defendant argues that § 875(c) is void for vagueness because the statute itself neither requires specific intent nor defines true threats. However, rather than making the statute void for vagueness, the narrowing construction provided by the relevant cases actually alleviates possible void-for-vagueness concerns. *See Boos v. Barry*, 485 U.S. 312, 329-30 (1988). Furthermore, we are convinced that the statute is not impermissibly vague. An ordinary citizen can understand what is meant by the terms "threat to kidnap" and "threat to injure," and we are persuaded that the statute provides sufficient standards to allow enforcement in a non-arbitrary manner.

## C.   Selective Prosecution

Defendant argues that he was subjected to selective prosecution. To succeed on this claim, Defendant must demonstrate that (1) other similarly situated individuals have not been prosecuted and (2) his prosecution was based on an impermissible motive. *United States v. Culliton*, 328 F.3d 1074, 1081 (9th Cir. 2003) (per curiam). The standard for proving such a claim "is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999). In reviewing a selective prosecution claim, this circuit has employed both a de novo and a clear error standard. *Culliton*, 328 F.3d at 1080.

**[4]** Defendant bases his selective prosecution claim on the government's failure to prosecute an unidentified Global Crossing employee who sent Defendant an email stating "If you post my info again I'm personally going to make sure you get your ass kicked." (E.R. at 35.) However, we are convinced that this employee was not a similarly situated individual. The employee sent a single textual email to Defendant in response to illegal and provocative communication previously posted

online by Defendant. In contrast, over the course of several months Defendant used text, music, voiceovers, and pictures to make multiple threats of violence against different individuals. The violence threatened by Defendant was much more serious in nature than the employee's threat, and Defendant's inclusion of personal information—such as the process server's license plate number and the attorney's home address—made his threats significantly more believable. Moreover, Defendant has not introduced any evidence even remotely showing that his prosecution was based on a discriminatory purpose. *See Wayte v. United States*, 470 U.S. 598, 610 (1985) (holding that to prove discriminatory purpose, defendant must show that government undertook particular course of action "at least in part because of . . . its adverse effects upon an identifiable group" (internal quotation marks omitted)). Thus, as in *Culliton*, Defendant "has no viable selective prosecution claim under any standard of review," 328 F.3d at 1080, and we accordingly affirm the district court's denial of Defendant's motion for dismissal based on selective prosecution.

## D.   Right to Counsel

**[5]** Defendant argues that he was denied his Sixth Amendment right to counsel when the district court held that he had implicitly waived this right and required him to proceed pro se at trial. We review de novo. *United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001). While we "indulge every reasonable presumption against waiver of" the right to counsel, *United States v. Meeks*, 987 F.2d 575, 579 (9th Cir. 1993) (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986)), a court may force a defendant to proceed pro se if his conduct is "dilatory and hinders the efficient administration of justice," *United States v. Leavitt*, 608 F.2d 1290, 1293 (9th Cir. 1979) (per curiam).

When it granted Defendant's sixth appointed attorney's motion to withdraw, the district court held that Defendant had

implicitly waived his right to counsel. The court found that Defendant's conduct had "compelled four of his prior attorneys to move to withdraw."[3] (E.R. at 379.) The court explained:

> From virtually the inception of this case Defendant has manipulated the proceedings and his relationships with five appointed lawyers so as to be able to claim that he wants to be represented by counsel while at the same time making it impossible for any competent lawyer to carry out his professional responsibilities. This conduct at times has consisted of threats; at least one lawsuit Defendant filed against a previous court-appointed lawyer; outbursts and harangues in court; defiant refusals to cooperate; rudeness; and hostility. Defendant's conduct required the Court to advise him, on several occasions, that he was at risk of waiving his right to counsel. Having fully (and more than once) advised Defendant of the risks and consequences attendant in defending himself without counsel, and having informed Defendant of the elements of the crimes of which he is accused as well as the potential penalties, the Court now finds and ORDERS that Defendant has waived his Sixth Amendment right to appointed counsel.

(E.R. at 381.) The court then ordered Defendant's sixth appointed attorney to act as standby counsel. The court later reiterated its reasoning for finding waiver of the right to counsel, telling Defendant, "You are proceeding without counsel because your conduct, although not your lips and your words, clearly and persistently reflected a refusal to be represented by counsel." (G.E.R. 360-61.)

---

[3]After meeting once with Defendant, the fifth attorney, who had been appointed as standby counsel, requested withdrawal based on scheduling conflicts.

The court's justification is amply supported by the record. In addition to insisting that all of his appointed attorneys were incompetent, Defendant accused his first attorney of obstructing justice; alleged that his second attorney's motion to withdraw was an attempt to cover up her incompetence and failure to comply with her professional responsibilities; accused his third attorney of unprofessional conduct and dishonesty and asserted that he had "summarily" dismissed this attorney "with extreme prejudice" (G.E.R. 40); refused to communicate with his fourth attorney, who he asserted did not represent him, and sued him for conspiracy to violate his civil rights; and accused his sixth attorney of perjury and threatened to sue him if he sought a continuance to prepare for trial. None of Defendant's accusations against his attorneys are supported by the record. Furthermore, Defendant indicated to the court that he intended to continue "go[ing] through" attorneys until the case was dismissed (G.E.R. 51), while a psychiatrist who evaluated Defendant believed that he was purposefully manipulating the proceedings in order to delay trial. Defendant's third attorney also told the court that Defendant "seem[ed] to be on a self-destructive path" and "seem[ed] to be wanting to steer this [case] towards some sort of a train wreck," (G.E.R. 42-43), and the sixth attorney believed that Defendant wanted him to go to trial inadequately prepared in order to create an issue of ineffective assistance of counsel.

**[6]** The court correctly advised Defendant of the risks of self-representation, the nature of the charges against him, and the penalties he faced. *See United States v. Robinson*, 913 F.2d 712, 714-15 (9th Cir. 1990). The court also warned Defendant more than once that he would be deemed to have waived his right to counsel if he persisted in sabotaging his relationships with his attorneys. In light of Defendant's continued antagonism and manipulative behavior, we are satisfied that the district court did not err in finding that Defendant knowingly and intelligently waived his right to counsel through his conduct. *See United States v. Moore*, 706 F.2d

538, 540 (5th Cir. 1983) ("[A] persistent, unreasonable demand for dismissal of counsel and appointment of new counsel . . . is the functional equivalent of a knowing and voluntary waiver of counsel.").

## E.    Speedy Trial Rights

Defendant argues that he was deprived of his statutory and constitutional rights to a speedy trial. We review de novo, reviewing the court's underlying factual findings for clear error. *United States v. Lam*, 251 F.3d 852, 855 (9th Cir. 2001).

**[7]** The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*, provides that a criminal defendant's trial must normally commence within seventy days of the filing of the indictment or the defendant's initial court appearance, whichever is later. However, certain periods of delay are excluded from the calculation of the seventy-day limit, including (1) delays due to competency proceedings, § 3161(h)(1)(A); (2) delays between the time of filing and the prompt disposition of pretrial motions, § 3161(h)(1)(F); and, (3) if the court sets forth in the record "its reasons for finding that the ends of justice served by the granting of [a] continuance outweigh the best interests of the public and the defendant in a speedy trial," delays caused by such continuances, § 3161(h)(8).

**[8]** The initial indictment in this case was filed on April 5, 2002, Defendant made his initial appearance on April 9, 2002, and trial began on November 12, 2003. However, all of the time between May 16, 2002, and October 22, 2002, and between October 23, 2002, and November 12, 2003, is excluded from our computation of the seventy-day limit due to pending pretrial motions, competency proceedings, and continuances under § 3161(h)(1)(A), (h)(1)(F), and (h)(8). Thus, only thirty-nine days of the period between April 9, 2002 and November 12, 2003, are counted under the Speedy Trial Act. Defendant argues that because he objected to many

of the continuances ordered by the court, delays due to those continuances should be included in our Speedy Trial Act calculation. However, the district court justified each of these continuances in accordance with § 3161(h)(8)(A). The district court explained that the continuances were necessary to allow appointed defense counsel time to prepare for trial given the complexity of the case, the large amount of electronic evidence, and the repeated changes in Defendant's representation. We see nothing clearly erroneous about this finding. Accordingly, we hold that Defendant's statutory right to a speedy trial was not violated.

**[9]** In addition to the statutory right, defendants have a Sixth Amendment right to a speedy trial. To determine whether Defendant's Sixth Amendment right was violated, we balance the length of the delay, the reason for the delay, Defendant's assertion of this right, and prejudice to Defendant. *Lam*, 251 F.3d at 855 (citing *Barker v. Wingo*, 407 U.S. 514, 529 (1972)).

**[10]** The length of the delay in this case—approximately twenty months between Defendant's March 26, 2002 arrest and his November 12, 2003 trial—is long enough to trigger a *Barker* inquiry. *United States v. Beamon*, 992 F.2d 1009, 1012-13 (9th Cir. 1993) (holding that twenty month delay is "more than sufficient to trigger the speedy trial inquiry under *Barker*"). We accordingly turn to the other *Barker* factors to determine whether Defendant's constitutional right to a speedy trial was violated.

**[11]** As to the second factor, we agree with the district court that any delay in the case was "almost entirely attributable to the course of conduct that [Defendant] systematically . . . engaged in." (G.E.R. 135.) As the government points out, "[a]t no point did the government request a continuance to better prepare its case or otherwise to gain an advantage, nor did the court cite a neutral reason such as overcrowded court dockets." (Appellee's Br. at 50.) Instead, the delays were all

either directly caused by Defendant or, as in the case of his competency proceeding, were deemed necessary in the interests of justice.[4] Thus, this factor overwhelmingly weighs against Defendant.

**[12]** Although the third *Barker* factor may at first glance appear to weigh in Defendant's favor, his repeated assertions of his speedy trial rights were completely belied by his conduct. *See United States v. Loud Hawk*, 474 U.S. 302, 314 (1986) (holding that defendants' repeated assertions of their speedy trial right had been contradicted by their filing of multiple frivolous petitions and unsuccessful motions before trial). Defendant was warned that each attorney the court appointed would need to go through the same learning curve in order to be ready to proceed to trial, yet he continued to sabotage his relationship with each appointed attorney, necessitating the delays. In light of this conduct, we hold that the third factor does not weigh in Defendant's favor.

**[13]** When a defendant is responsible for the delay, he "carries a heavy burden of demonstrating actual prejudice to succeed on a speedy trial claim." *Lam*, 251 F.3d at 859. " 'Actual prejudice can be shown in three ways: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired.' " *Id.* (quoting *Beamon*, 992 F.2d at 1014). The last of these is the most serious. *Id.* at 860. While Defendant argues that he suffered from anxiety and concern due to his long period of pretrial incarceration, we conclude, under the circumstances of this case, that this allegation is insufficient to demonstrate that Defendant suffered impermissible prejudice as a result of the delays he caused. *See United States v. Casas*, 425 F.3d 23, 34-35 (1st Cir. 2005) (holding defendants' allegations of anxiety and concern during forty-one month period of pretrial incar-

---

[4]Indeed, the competency proceeding itself was arguably caused by Defendant's conduct, as it was his behavior with respect to his appointed counsel that caused the court to question his competency.

ceration insufficient to show unconstitutional prejudice where delay was at least partially attributable to defendants, time served was credited against sentences they received upon conviction, and government was not seeking death penalty). Rather, we are convinced that the district court acted entirely appropriately in allowing Defendant's substituted counsel time to prepare for trial. Indeed, Defendant's defense would clearly have been prejudiced had the court *granted* his requests to have newly appointed counsel represent him at trial with only minutes or days of preparation beforehand. Accordingly, considering the *Barker* factors as a whole, we conclude that Defendant's Sixth Amendment right to a speedy trial was not violated.

## F. Recusal

Defendant also appeals the denial of his motions for recusal of the trial judge. We review for abuse of discretion. *United States v. Wilkerson*, 208 F.3d 794, 797 (9th Cir. 2000).

**[14]** Defendant's recusal motions were based on the trial judge's alleged failure to appoint competent counsel to represent Defendant, his order that Defendant's competency to stand trial be evaluated, his order that Defendant not communicate directly with the court while represented by counsel, and his alleged failure to consider Defendant's motions to dismiss the indictment, as well as the fact that Defendant filed a civil complaint alleging that the trial judge was involved in a conspiracy to violate Defendant's constitutional rights. His recusal motions were randomly assigned to a different district court judge and were denied. As the judge ruling on the motions correctly noted, " 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.' " (E.R. at 175 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).) "Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555. Even hostile judicial remarks made during the course of a trial will not ordinarily support a challenge to the judge's partiality. *Id.*

Moreover, "[a] judge is not disqualified by a litigant's suit or threatened suit against him, or by a litigant's intemperate and scurrilous attacks." *United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986) (citation omitted). Because Defendant failed to make the required showing that the trial judge's actions or remarks were based on an extrajudicial source or "reveal[ed] such a high degree of favoritism or antagonism as to make fair judgment impossible," *Liteky*, 510 U.S. at 555, we conclude that the motion judge did not abuse her discretion in denying Defendant's motions for recusal.

## G.   Request to Reconstruct Website

**[15]** Defendant contends that the district court erred in denying his pre-trial motion to order the government to reconstruct the entire website for purposes of trial. Reviewing for abuse of discretion, *United States v. Ross*, 206 F.3d 896, 898 (9th Cir. 2000), we affirm. When Defendant made this motion, he had received copies of everything that the FBI case agent and Global Crossing specialists had copied from the website during their respective investigations. He had also received copies of the electronic trial exhibits created by the government. Thus, all of the material that would be displayed and discussed by any of the witnesses was readily available to him. Defendant was informed that he could try to elicit evidence on any materials from the website that had not been archived during the investigation and that would help show the context of his postings. Furthermore, because the website was stored on several different servers and involved large amounts of information—including myriad internal and external hyperlinks—that Defendant frequently changed, his request to reconstruct the entire website was not even feasible. Thus, the court did not abuse its discretion in denying his motion.

## H.   Evidence of Rifle Possession

Defendant also appeals the district court's denial of his motion in limine to exclude evidence that he possessed a rifle,

bayonet, and ammunition during the time in which he transmitted his threats. We again review for abuse of discretion. *Id.*

**[16]** The court allowed admission of this evidence subject to a limiting instruction, telling the jury that it should consider the evidence only for the limited purpose of determining whether the government had proven Defendant's specific intent to threaten. Defendant's specific intent was a highly contested issue at trial, as Defendant contended that the phrase "I am now armed" was intended to convey only that he was "armed with information" and that the phrase "I will kill you" was ambiguous and was not intended to threaten physical violence. Thus, the government introduced evidence of Defendant's weapon possession to demonstrate that he actually intended to threaten violence and was not innocently talking about being armed with information or about stabbing and killing in some metaphorical sense. Given the language and context of the threats, we agree that the evidence tended to prove that Defendant had the requisite specific intent to threaten. We therefore conclude that the district court did not abuse its discretion by allowing evidence of the rifle for this limited purpose. While we note that other circuits have reached a contrary result in somewhat similar factual situations, s*ee, e.g., United States v. Himelwright*, 42 F.3d 777 (3d Cir. 1994); *United States v. Philibert*, 947 F.2d 1467, 1470-71 (11th Cir. 1991), it is important to point out that those circuits do not require the government to prove that the defendant acted with specific intent to threaten. Consequently, we do not find their reasoning on this issue persuasive.

## I.  Motion for Judgment of Acquittal

Defendant appeals the district court's denial of his motion for acquittal. We review de novo, asking whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Tisor*, 96 F.3d 370, 379 (9th Cir. 1996).

Defendant argues that he should have been acquitted on the § 1028(a)(7) counts because the government failed to prove the statutory intent element. Defendant was convicted of violating § 1028(a)(7), which at the time of his trial prohibited "knowingly transfer[ring] or us[ing], without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." 18 U.S.C. § 1028(a)(7) (2000) (amended 2004).[5] Defendant contends that the statutory phrase "intent . . . to aid or abet" imports all of the elements required in a conviction for aiding and abetting itself. Therefore, he argues, his conviction for transferring social security numbers "with the intent to aid and abet . . . false representation of Social Security numbers" (E.R. at 186) required the identification of a principal and proof that the crime of false representation was actually committed.

[17] There is no question that a conviction for aiding and abetting a crime requires proof that the underlying crime was committed, but we do not agree with Defendant that a conviction under § 1028(a)(7) requires such proof. It is axiomatic that a criminal conviction requires the occurrence of a crime. Thus, a defendant can only be convicted for aiding and abetting where some underlying crime has been committed. *United States v. Powell*, 806 F.2d 1421, 1424 (9th Cir. 1986). Indeed, "[a]iding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense." *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005). In contrast, a conviction under § 1028(a)(7) is based on the defendant's unlawful action of transferring or using another individual's means of identification with the intent to commit or to aid or abet other unlawful activity. Thus, the defendant's action in itself constitutes the crime for which he is convicted—a "separate

---

[5]The 2004 amendment added the word "possesses" after "transfers" and added the phrase "or in connection with" after "or to aid or abet."

and distinct offense" from the crime that he intends to commit or to aid or abet. *Cf. United States v. Navarro*, 476 F.3d 188, 195 n.10 (3d Cir. 2007) ("[T]he offense of burglary was completed when the defendant entered the building with the intent to commit a felony (whether or not he actually committed that felony) . . . ."). We therefore hold that the government must only prove that the defendant committed the unlawful act with the requisite criminal intent, not that the defendant's crime actually caused another crime to be committed. As to Defendant's argument that the government was required to identify a principal whom he intended to aid or abet, we first note that identification of a principal is not even an element for an aiding and abetting conviction. *Powell*, 806 F.2d at 1424. Moreover, because we conclude that a § 1028(a)(7) conviction requires no evidence of an underlying crime, we hold that the government need not prove even the existence of a principal.

**[18]** Having thus determined, we now consider whether the government introduced sufficient evidence to prove that Defendant had the intent to aid and abet false representation of social security numbers. Viewing the evidence in the light most favorable to the prosecution, we conclude that it did. The evidence introduced at trial amply supported a conclusion that, as part of his scheme to give himself an advantage in his dispute with Global Crossing, Defendant posted Global Crossing employees' personal information online with the intent to entice and assist other individuals to take advantage of the information to the employees' detriment. The government introduced evidence that Defendant posted the social security numbers of well over a thousand Global Crossing employees online, linking some of this information to an article outlining the dangers of identity theft. He picketed outside the Global Crossing building with a sign advertising the website. He indicated on the website that individuals whose information was posted online might feel "uncomfortable" (G.E.R. at 272) and warned Global Crossing employees that "as time passes, this will only get worse" (G.E.R. at 463). He stated that additional information about certain individuals was only

"omitted for the time being." (G.E.R. at 281.) He told employees that he would only remove their information if they acceded to his demands. His statements on the website clearly demonstrated his knowledge that publishing social security numbers online could have detrimental effects on the employees. Moreover, the website's contents supported a conclusion that Defendant was expecting and hoping that persons engaged in identity theft would actually use the information to the detriment of Global Crossing employees. We agree with the government that "[e]verything about the way [Defendant] expressed and published others' personal information indicated that he was threatening to see it used, and intending to see it used, for a bad purpose, namely, its fraudulent use by someone else." (Appellee's Br. at 69.) Accordingly, we hold that the jury could reasonably conclude from the evidence that Defendant acted with the intent to aid and abet the false representation of social security numbers.

[19] Defendant also appeals the court's denial of his motion for acquittal on the threat counts, arguing that his statements were not true threats. True threats, defined as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," fall outside the protections of the First Amendment. *Black*, 538 U.S. at 359-60. Defendant contends that his statements were not true threats because they were made in the context of a labor dispute. We find this contention unpersuasive. While expressions of general opposition to Global Crossing and its employment policies would likely constitute constitutionally protected speech, Defendant's statements—which explicitly threatened named individuals with bodily harm—are not protected by the First Amendment simply because they were made after Defendant was fired by Global Crossing. We are likewise unpersuaded by Defendant's argument that his threats against the process server were not true threats because they were conditioned on her appearing near him or his family again. While the conditional nature of a statement may be a factor

in determining whether it constitutes a true threat, *see Watts v. United States*, 394 U.S. 705, 708 (1969), conditional language is not dispositive. Indeed, "[m]ost threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats." *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990). Therefore, when a communication "constitutes a clear and unambiguous threatening statement," "the conditional nature of [the] statement does not make the statement any less of a 'true threat' simply because a contingency may be involved." *United States v. Hoffman*, 806 F.2d 703, 711 (7th Cir. 1986). Considering the content of Defendant's statements and the context in which they arose, we are convinced that they constituted true threats.

## J.   Motions to Dismiss the Indictment

Defendant also challenges the district court's denial of his motions to dismiss the indictment for failure to sufficiently state an offense. We review this issue de novo. *United States v. Fleming*, 215 F.3d 930, 935 (9th Cir. 2000). Indictments are "legally sufficient if, as a whole, they adequately apprised the defendant of the charges against him." *United States v. Severino*, 316 F.3d 939, 943 (9th Cir. 2003) (internal quotation marks omitted).

[20] Defendant first argues that the indictment did not include a sufficient description of the facts and circumstances surrounding the threat counts. This contention is without merit, as the indictment clearly stated the factual background of the charged offenses, including Defendant's dispute with Global Crossing and his creation of the website, the names of his alleged victims and the nature of their associations with Global Crossing, the verbatim text of the threats, and the dates on which the threats were seen on his website. Defendant also argues that the indictment was insufficient as to the § 1028(a)(7) counts because it failed to identify a principal. As discussed above, however, we conclude that the statute

does not require the identification or even existence of a principal, so long as the defendant acts with the requisite intent to entice or assist others in committing the unlawful activity.

## K.　Jury Instruction on Threats

[21] Defendant argues that the jury was erroneously instructed to apply an objective, rather than subjective, test to determine whether his statements constituted true threats. Given our contradictory case law on this issue, it is not clear that the instruction was actually erroneous. *See United States v. Stewart*, 420 F.3d 1007, 1016-18 (9th Cir. 2005) (discussing our conflicting precedent; declining to resolve issue). Regardless, the district court instructed the jury that specific intent to threaten is an essential element of a § 875(c) conviction, and thus the jury necessarily found that Defendant had the subjective intent to threaten in convicting him of the offense. Therefore, any error in the "true threats" instruction was harmless.

## L.　Sentencing

Defendant raises two sentencing arguments. First, he argues that he was denied his right to counsel at sentencing. Second, he argues that the case should be remanded for *Booker* error.

[22] Reviewing Defendant's first argument de novo, *see United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998), we hold that Defendant was not unconstitutionally deprived of his right to counsel at sentencing. As discussed above, Defendant's conduct forced several successively appointed trial attorneys to request withdrawal from representation, and the court eventually held that Defendant had implicitly waived his right to counsel. After the trial had concluded, the court encouraged Defendant to utilize his trial standby counsel as his counsel at sentencing. The court instructed standby counsel that he should prepare and file a sentencing memorandum

and respond to whatever the government might file, regardless of whether Defendant authorized the filing. The court also permitted Defendant to file independent pleadings. Defendant was not entitled to the appointment of yet another attorney to represent him at sentencing, having already waived that right through his conduct, and the court in fact attempted to ensure that he would not be prejudiced by his pro se status. Accordingly, we deny Defendant's request for resentencing based on the right to counsel.

As to Defendant's *Booker* argument, because he was sentenced pre-*Booker* and did not raise a Sixth Amendment objection in the district court, we conduct the inquiry prescribed by *United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc). Under *Ameline*, we will only remand for resentencing if the district court's reliance on the then-mandatory Sentencing Guidelines affected Defendant's "substantial rights." *Id.* To prevail, Defendant must show that "the probability of a different result [i.e., a lower sentence] is sufficient to undermine confidence in the outcome of the proceeding." *Id.* (internal quotation marks omitted). He "must demonstrate a reasonable probability that he would have received a different sentence had the district judge known that the sentencing guidelines were advisory." *Id.*

[23] Here, we see no "reasonable probability" that the district court would have imposed a lower sentence had it known that the Guidelines were advisory. The court sentenced Defendant to the top of the applicable Guidelines range, based on its "very considered view that the offenses . . . committed warrant very firm punishment and that [Defendant] continues to display a refusal to acknowledge that, like every other citizen in this country, he is subject to the evenhanded application of all of the laws." (G.E.R. at 454.) Indeed, the court told Defendant that "[i]f there were a crime . . . that consisted of arrogance, I would depart upward to sentence you to a much longer sentence." (G.E.R. at 454.) Thus, Defendant has not

demonstrated that his substantial rights were affected by the *Booker* error, and we accordingly affirm his sentence.

**AFFIRMED.**