**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JONATHAN GLEN TURNER, AKA
J.T., AKA Jon Turner, AKA Jon
G. Turner, AKA Jonathan G.
Turner,
*Defendant-Appellant.*

Nos. 14-50238
15-50068

D.C. No.
8:09-cr-00210-JVS-1

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted November 17, 2017
Pasadena, California

Filed July 27, 2018

Before:  Milan D. Smith, Jr.[*] and Sandra S. Ikuta, Circuit Judges, and Robert W. Gettleman,[**] District Judge.

Opinion by Judge Ikuta

---

### SUMMARY[***]

---

### Criminal Law

The panel affirmed convictions for two separate fraud schemes pursuant to trials in 2009 and 2012.

The panel held that the defendant's Sixth Amendment right to counsel was not violated in the 2009 case when the district court partially rejected the eighth request for a continuance, after continuing the trial for over two and half years.

Because the district court reasonably concluded that the defendant had repeatedly alternated between invoking his right to self-representation and his right to counsel in order to

---

[*] This case was submitted to a panel that included Judge Kozinski, who retired.  Following Judge Kozinski's retirement, Judge Smith was drawn by lot to replace Judge Kozinski.  Ninth Circuit General Order 3.2.h.  Judge Smith has read the briefs, reviewed the record, and listened to the oral argument.

[**] The Honorable Robert W. Gettleman, United States District Judge for the Northern District of Illinois, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

manipulate proceedings and cause delay, the panel rejected the defendant's claim that the district court violated his Sixth Amendment right to counsel in the 2012 case by requiring him to represent himself.

The panel held that the district court did not abuse its discretion in determining that the defendant was not entitled in either trial to CJA funds to hire a psychiatrist to conduct a mental evaluation, and that the district court did not err in failing to hold a sua sponte competency hearing in the 2012 trial. Because a reasonable court would not doubt the defendant's competency, the panel held that the district court did not err in denying the defendant's motion for mistrial and in its decision not to terminate the defendant's self-representation.

## COUNSEL

Katherine Kimball Windsor (argued), Law Office of Katherine Kimball Windsor, Pasadena, California, for Defendant-Appellant.

George E. Pence (argued), Assistant United States Attorney; Lawrence S. Middleton, Chief, Criminal Division; Sandra R. Brown, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

IKUTA, Circuit Judge:

Jonathan Turner appeals his convictions for two separate fraud schemes pursuant to trials in 2009 and 2012. We conclude that Turner's Sixth Amendment right to counsel was not violated in the 2009 case when the court partially rejected the eighth request for a continuance, after continuing the trial for over two and half years. Because the court reasonably concluded that Turner had repeatedly alternated between invoking his right to self-representation and his right to counsel in order to manipulate proceedings and cause delay, we also reject Turner's claim that the district court violated his Sixth Amendment right to counsel in the 2012 case by requiring him to represent himself. Finally, we reject Turner's claims that the district court erred in not authorizing funds to hire a psychiatrist to conduct a mental evaluation, in not sua sponte conducting a competency hearing, and in not declaring a mistrial during the 2012 trial. Accordingly, we affirm.

I

This appeal arises from two criminal convictions for separate fraud schemes. The two cases will be referred to as the "2009 case" and the "2012 case," corresponding to when indictments in the cases were issued. As a result of Turner's behavior, both cases had circuitous routes to trial, marked by the defendant's requests for multiple continuances, his complaints about and changes to his counsel interspersed with requests to represent himself and periods of proceeding pro se, and his frequent, changing complaints regarding a panoply of medical symptoms and treatments. In order to provide the

context for Turner's claims, we set out a lengthy, chronological history of Turner's interaction with the court, indicating which incidents relate to the 2009 case, the 2012 case, or both.

*2009 case.* On October 14, 2009, a federal grand jury indicted Turner, charging him with two counts of mail fraud in violation of 18 U.S.C § 1341 and two counts of wire fraud in violation of 18 U.S.C. § 1343. The indictment alleged that between January 2005 and June 2006, Turner defrauded investors by telling them that he was in the business of importing goods from Asia and reselling the goods to purchasers in the United States. He told victims that he would use their investment to pay for the purchase or manufacture of goods, and then use the profit from reselling the goods to repay them at a specified rate of return. These were falsehoods. In fact, Turner used the victims' money to enrich himself and to make payments of interest and principal to other victims so as to continue his Ponzi-like scheme.

At his December 14, 2009 arraignment, Turner was represented by Anne Hwang, a deputy federal public defender. The case was assigned to Judge Guilford, sitting in the Santa Ana Division of the Central District of California. Jesse Gessin, another deputy federal public defender, replaced Hwang as Turner's counsel in March 2010. The parties stipulated to two continuances, which continued the proposed trial date from February 9, 2010 to May 31, 2011.

On May 5, 2011, Gessin notified the court that he had learned that Turner had retained Las Vegas counsel, Michael Cristalli, who would substitute in as counsel if given six to nine months to prepare. The court agreed to continue the trial until November 29, 2011. In November 2011, the parties

stipulated to a further continuance to February 28, 2012, which the court granted. On January 3, 2012, Cristalli moved to withdraw as Turner's counsel, citing a "complete breakdown in communication." After the court granted this motion, Turner requested a fifth continuance to seek new counsel. The court granted his request and set a trial date for May 15, 2012.

On March 19, 2012, Turner appeared in court without counsel. He claimed that the government had seized his bank accounts and so he was unable to hire counsel of his choice, and filed a motion to require the government to apologize. The government denied seizing or closing his accounts.[1] The court offered to appoint a representative of the public defender's office, but Turner declined because he believed his "case [was] too complex." Instead, Turner decided to proceed pro se. The court conducted a colloquy with Turner pursuant to *Faretta v. California*, 422 U.S. 806 (1975), informing him of the disadvantages of representing himself and an estimate of potential penalties. The court found that Turner had knowingly and voluntarily waived the right to counsel, and permitted him to represent himself. Nevertheless, the court appointed Gessin to serve as standby counsel.

On April 16, 2012, Turner moved pro se for a sixth continuance, and asked the court that a trial date be set for sometime after September 10, 2012. The government objected to a further continuance, given that the case was almost three years old. In a hearing on April 23, 2012, the

---

[1] The court eventually denied Turner's motion. The record indicates that the bank had frozen Turner's bank accounts but shows no government involvement in this decision.

court considered Turner's and the government's arguments and stated that "[i]t is now appearing to me that the defendant is purposefully delaying this case." Nevertheless, it granted a continuance, over the government's objection, to July 31, 2012.

*2012 case.* On April 18, 2012, while the 2009 case was pending, a federal grand jury indicted Turner for three counts of wire fraud under 18 U.S.C. § 1343 and a sentencing enhancement for committing offenses while on pretrial release under 18 U.S.C. § 3147. According to the indictment, Eric Homa, a chiropractor, invented a device called the "Gorilla Back," which was designed to provide lower back support. In 2011, Turner formed a company with Homa's wife, Amber Homa, for the purpose of manufacturing and selling the Gorilla Back. Turner and the Homas agreed to split the manufacturing costs. Thereafter, Turner created fraudulent purchase orders and tricked the Homas into investing their savings, as well as money borrowed from other victims, to pay the manufacturing costs to fulfill these phony orders. Turner deposited these funds into his own bank account and used them for his personal benefit.

At the arraignment hearing on May 9, 2012, the court appointed Dean Steward (a private attorney who accepts assignments to represent indigent defendants pursuant to the Criminal Justice Act (CJA)), to represent Turner in the 2012 case. This case was also assigned to Judge Guilford. The court set the 2012 trial for August 21, 2012.

*2009 case.* On June 4, 2012, Turner asked the court to appoint Steward as his counsel in the 2009 case as well. The court granted this request, and relieved Gessin of his duties as

standby counsel.  The court continued the 2009 trial a seventh time to September 25, 2012.

*2012 case.*  At a hearing on July 30, 2012, Turner stated that he had no difficulties with Steward in the 2009 case but he was concerned about the attorney's "limitations," namely that Steward had to "get approval from the court to do certain things."  Turner therefore asked to represent himself in the 2012 case but nevertheless stated he wished Steward to continue to represent him in the 2009 case.

*2009 and 2012 cases.*  After a closed hearing outside the presence of the government, the court denied Turner's motion to proceed pro se in the 2012 case.  The court ruled that Steward would remain Turner's counsel in both the 2009 and 2012 case.  The court retained the September 25, 2012 trial date for the 2009 case, and continued the trial date for the 2012 case to December 11, 2012.

On August 12, 2012, Turner filed another motion to represent himself in both the 2009 case and the 2012 case.

On August 22, 2012, contrary to his August 12 motion, Turner moved to replace Steward with a new attorney, Houman Fakhimi, in the 2009 case.  At an August 27, 2012 hearing, Fakhimi stated he would not be ready to try the case on September 25, 2012, the date set for trial, because he needed to gather "bits and pieces of information," including interviewing two potential witnesses and reviewing some additional documents about contracts with the victims of the scheme.  Fakhimi asked to continue the trial until late November or December.  The government attorney, who was pregnant and had a due date in mid-November, stated she could agree only to a two week continuance, until October 9.

After listening to both sides' concerns, the court ruled that Turner had the option of remaining with Steward and the September 25 trial date, or substituting Fakhimi and continuing the trial until October 9.

After discussions with Turner, Fakhimi proposed the following approach—he would withdraw his substitution request and would review the documents in the case. If he believed he would be ready for trial by October 9, he would resubmit his substitution request by August 31. If not, Steward would continue as Turner's counsel in the 2009 case and proceed to trial on September 25. Turner conferred with Fakhimi, and asked the court to confirm his understanding of the plan: "So if Mr. Steward is on, it would be the 25th; and if my counsel would come on, it would be October 9?" The court responded, "Correct. Is that OK with you?" Turner stated "Yes."

At the same hearing (but outside the presence of the government attorney) the district court considered Turner's August 12 request to represent himself in the 2012 case. The court asked Turner six times whether he wanted to represent himself, and Turner gave equivocal responses to each question. Finally, in response to the court's seventh reiteration of the question, Turner stated "No, Your Honor," but also stated he would try to retain a replacement for Steward.

*2009 case*. On August 27, 2012, the court filed an order confirming the plan discussed at the hearing. Fakhimi did not resubmit a request to substitute as Turner's counsel, so the trial remained scheduled for September 25.

On September 13, 2012, less than two weeks before trial, Turner filed a request to dismiss Steward and represent himself in the 2009 case "to assure that all elements, facts, and disclosures are made." In a hearing on September 17, Turner claimed that "there has been a complete breakdown of communication with Mr. Steward," that Steward made statements about jury selection that Turner construed to be "racist remarks," that Steward was not adequately communicating with Turner's family, and that Steward had given him "three different answers of why he was appointed to [Turner's] case." After listening to Turner's concerns, the court recounted the long history of Turner's vacillation between proceeding pro se and with counsel. In sum, the court had granted eight continuances, Turner had been represented by four different counsel and had sought a fifth, and Turner had asked to proceed pro se three times, but had changed his mind after the first two. The court stated that Turner had "lost credibility with this court" and that it believed Turner was "doing this for purposes of delay." The court then denied Turner's request to represent himself. In explaining its reasons, the court stated the request was not timely, particularly in light of the many continuances the court had previously given him, Turner's most recent statement that he would proceed with Steward and the government's reliance on that statement to subpoena and prepare witnesses, and the pendency of the trial in just a few days.

The trial in the 2009 case proceeded as scheduled, with Steward acting as counsel. Throughout the trial, Turner repeatedly attempted to bring motions before the court independent of his counsel. The court denied these motions, and told Turner to bring such motions through Steward.

After the government rested, Turner filed a motion for a mistrial and to proceed pro se due to Steward's alleged conflict of interest. The motion alleged, among other things, that "attorney Steward . . . was intentionally appointed to be the defendant's counsel so that the defendant would not have adequate counsel or an adequate defense." The court expressed its frustration with Turner's submission of this motion, stating:

> A great deal of time has been spent in this trial trying to line Mr. Turner up with suitable counsel for him. I have made a finding, a conclusion, frankly, that much of these efforts have been in bad faith by the defendant . . . there are elements of bad faith in the defendant's repeated motions, requests, hearings, et cetera, concerning counsel, going way back to the first efforts by the defendant in that regard.

But because Turner presented a motion concerning inadequate representation due to his attorney's conflict of interest, the court concluded that it had to schedule a hearing to listen to Turner's concerns directly. At the hearing, Turner explained that Steward had a relationship with a person who was seeking information about the FBI's intimidation of a government witness; as a result, Steward was preventing Turner from presenting certain parts of his defense. The district court denied the motion and found that Turner's statements were "further examples of [his] efforts to unfairly delay, confuse and plant error into these proceedings." The court also found that Turner's assertions were not factually accurate and that Steward had provided excellent representation. In a subsequent written order, the court

confirmed its finding that Turner's request "was made in bad faith for the purposes of delay." The court also found that Turner "has engaged in other bad conduct, such as falsely claiming that he had medical problems."[2]

A jury returned guilty verdicts on all counts on October 5, 2012.

Steward subsequently filed a motion asking to be relieved in the 2009 case. The court granted this motion.

*2012 case.* On October 18, 2012, Turner moved to represent himself in the 2012 case. The court conducted a *Faretta* colloquy. During the colloquy, the prosecutor mistakenly stated that Turner had been charged with mail and wire fraud, although the 2012 indictment included only wire fraud, and also erroneously stated that the maximum penalty for each count was 30 years' imprisonment when the correct statutory maximum was 20 years. The prosecutor failed to state the statutory maximum for a violation of 18 U.S.C.

---

[2] The order denying Turner's motion stated, in pertinent part:

> Besides Defendant's substantial history of delay, the fact that Defendant's written request to proceed pro se was made less than two weeks before trial and was accompanied at the Status Conference by a request for a continuance is also "strong evidence of a purpose to delay." *Farias*, 618 F.3d at 1052. Defendant specifically said that, if he were allowed to represent himself, the trial would have to be continued yet again to permit him to prepare his defense. Not only could Defendant have made the *Faretta* request earlier, he in fact *has* asked to represent himself twice. Each time, he eventually withdrew the request. This time, the Court **DENIES** Defendant's request.

§ 3147, which was also charged in the indictment. At the end of the colloquy, the court found that the Turner had knowingly and voluntarily waived the right to counsel, and permitted Turner to represent himself in the 2012 case. On November 19, 2012, the 2012 trial was continued to April 8, 2013.

*2009 case*. On October 30, 2012, the court appointed a new CJA panel attorney, Robison Harley, to represent Turner at sentencing in the 2009 case. On January 2, 2013, Harley moved for CJA funds under 18 U.S.C. § 3006A(e)(1) for a psychiatric evaluation in order to assist in sentencing preparation and a new trial motion in the 2009 case. Harley's application stated that although Turner "is quite intelligent," he does show "certain mental, emotional, and mood disorders which might support a diminished capacity defense to the [sic] mental state charges." Harley noted that prior counsel had indicated that Turner's communications were "becoming more bizarre and irrational," and that Turner had "a long and well-documented history of ADD [attention deficit disorder] and ADHD [attention deficit hyperactivity disorder]."

On January 22, 2013, the district court denied the request, finding that the defense had failed to carry its burden to "adequately show such an evaluation is necessary." The court stated that the descriptions of "'certain mental, emotional, and mood disorders' and 'bizarre and irrational' communications" were vague, and even if there had been evidence that Turner was currently suffering from a mental impairment, this would not show that Turner suffered from a mental impairment at the time the alleged crimes occurred. The court further held that Harley had failed to explain how a mental evaluation would be necessary for bringing motion for a new trial or sentencing preparation under the applicable

legal standards. The court found that Turner "demonstrated a history of either hypochondria or purposeful attempts to manipulate the system through excessive claims of physical (though not mental) maladies that were disproved by credible health professionals."

*2012 case.* On April 4, 2013, the court held a status conference in both the 2009 and 2012 case. With respect to the 2012 case, Turner complained about a range of issues relating to "[d]iscovery, [c]onstitutional violations of due process, access to the courts . . . . and the right to own counsel being blocked." He also confirmed a report from prison officials to the district court that he wiped his feces on the wall of his cell in the Santa Ana City Jail because he was "not being fed."[3] Turner moved to continue trial in the 2012 case. The court granted the motion, and trial was continued to July 16, 2013.

*2009 and 2012 cases.* On April 15, 2013, Judge Guilford recused himself from sentencing in the 2009 case and from presiding over the 2012 case after learning that one of Turner's victims in the 2012 case had been the judge's next-door neighbor. Both cases were reassigned to Judge Selna, who also sat in the Santa Ana Division of the Central District of California. The court held its first status conference on both cases on April 17, 2013, and asked Turner if he wanted to continue to represent himself, to which Turner stated, "yes sir." Turner also asked to be moved to the Metropolitan Detention Center (MDC), because in the West Valley Detention Center where he was housed, he was having

---

[3] Turner was held at the Santa Ana jail, the Orange County jail, the West Valley Detention Center, and the Metropolitan Detention Center (MDC) at various different points during the 2009 and 2012 proceedings.

difficulties making copies and issuing subpoenas, ensuring that his mail was being sent out by the prison, obtaining food (because "there [we]re pieces of razor blade" and metal in the food provided by the prison), and obtaining his medication. The court recommended the marshals move him to MDC. Turner was transferred to the MDC on April 18, 2013.

*2012 case.* At a status conference on May 6, 2013, Judge Selna revisited the question whether Turner wanted to represent himself in the 2012 case. In response to the court's question, Turner stated "I would request if I could get 30 days to consult with an attorney to see if I can have them come on my case as my own counsel." The court granted Turner's request for 30 days to attempt to retain counsel and scheduled a new status conference on June 10, but warned Turner that if he did not retain new counsel, the trial would remain scheduled for July 16.

At the status conference on June 10, Turner stated he had interviewed a number of attorneys, had narrowed his list to three, and was within a week or two of retaining a new attorney. The court set another conference on June 25, but reiterated that the July 16 trial date remained firm.

At the hearing on June 25, Turner claimed he had a back injury that required him to use a wheelchair, and refused to be transported to court. He therefore appeared telephonically. Turner told the court that he had not secured an attorney but was only waiting to give power of attorney to someone who could hire the attorney on Turner's behalf. The court set a July 8 status conference and reminded Turner that the trial was on July 16.

On July 1, Turner filed a motion to stay the 2012 case indefinitely. He alleged he was physically mistreated while housed at the Orange County Jail before his transfer to the MDC. He also alleged he suffered from numerous medical issues including a lower groin hernia, a herniated disc and degenerated disc, severe back pain and numbness through his lower body, and a nodule on his thyroid. He stated he needed two biopsies and further testing for cancer. Turner claimed that his constitutional rights relating to due process, access to the courts, and access to counsel of choice had been violated. He also claimed that all the prior issues were compounded by "family issues" and "mental anguish and stress." The government opposed the motion, arguing, among other things, that the defendant had not provided any evidence supporting his medical claims.

The court scheduled a July 8 hearing on these issues. After Turner again refused to be transported to the court, the court asked MDC medical staff to conduct a physical examination of Turner and advise the court regarding his medical condition and his transportation needs. According to MDC's report, Dr. Toh, a doctor at MDC, examined Turner and determined that Turner had spondylosis of the back, but could move both of his legs, had no hand or wrist injuries, and had no restrictions in transportation. The court then directed Turner to be brought to a hearing on July 10.

At the July 10 hearing, Turner discussed his numerous medical complaints at length, and stated that he needed to have those issues addressed before he could stand trial. In response to the court's question whether he had retained counsel, Turner stated that retained counsel would arrive at MDC the following day. The court told Turner that if he had not retained counsel by July 12, 2013, he would have to

represent himself, and that trial would start July 18. The court found that it was "unfair to the court system and unfair to the government to engage in the pattern which I'll charitably call dalliance, shuttling between being represented by yourself and by counsel."

The court then decided to conduct a second *Faretta* hearing. During the colloquy, Turner was correctly informed of the nature of the charges against him, the possible penalties, as well as the dangers and disadvantages of self-representation. This time, however, Turner refused to answer the court's questions, demanded to have counsel of his choice, and claimed that his constitutional rights were being violated. The court concluded that "the previously taken *Faretta* waiver is still valid," and the new colloquy reinforced the previous waiver "to the extent that the defendant has been explicitly advised of the pitfalls of representing himself."

On July 16, 2013, the court issued an order denying Turner's motion to stay the trial due to his medical issues. The court concluded that Turner was medically fit to proceed to trial as scheduled, based on a review of a medical report prepared by MDC medical staff, and rejected his other arguments.

On July 19, immediately before the court called the venire panel, Turner raised several issues. First, he claimed that he had several medical problems that were not being addressed by MDC medical staff. The court stated that a report from Dr. Toh on July 11, 2013 addressed these issues. Turner also claimed that he was not receiving his medication for attention deficit disorder. The court issued an order directing MDC to inform the court as to whether Turner's attention deficit disorder or attention deficit hyperactivity disorder prevented

him from proceeding to trial, and whether Turner required Adderrall (a medication used to treat attention deficit hyperactivity disorder) or other medication to proceed to trial.

Turner also addressed his concerns about obtaining his choice of counsel, and stated "I would like to see if I can receive some unbiased pro bono attorney from L.A." The court asked Turner if he was formally requesting the court to appoint panel counsel. Turner initially equivocated, stating that he would like to have a choice of panel counsel, or at least have panel counsel out of Los Angeles, not Orange County. Turner again raised his concern that Steward had a conflict due to a friendship with a person who was investigating the FBI, and claimed that he could not accept other attorneys from the Southern Division CJA panel because they were friends with Steward. The court rejected this request, stating that Turner's concerns were speculative, and it found no reason to recuse all lawyers on the CJA panel for the Southern Division. In response to the court's question whether Turner was formally requesting appointment of a CJA lawyer, Turner stated, "Yes, if I can't have my counsel of choice." The court stated it would consider whether to appoint counsel or require Turner to proceed pro se in view of the delay, and would further address the matter at a hearing on July 22, 2013 (the following Monday).

On July 22, in response to the court's order, MDC submitted a letter stating that when Turner arrived at jail, he informed staff that he had stopped taking Adderall for attention deficit hyperactivity disorder a year prior. He was evaluated by the staff physician and referred to a psychologist, who concluded he did not exhibit symptoms of attention deficit hyperactivity disorder or present significant mental health concerns.

At the July 22 hearing, the court balanced its finding that Turner "is engaged in tactics to prolong the date of trial" against "the fundamental right to a lawyer," and decided, "although it is a close question," to appoint counsel for Turner and continue the trial. The court asked Harley to accept the appointment, and Harley conferred with Turner. In response, Turner first expressed his concerns about being represented by counsel from the Southern Division CJA panel. He then stated he was filing a motion for Judge Selna to recuse himself because he had conferred with Judge Guilford regarding Judge Guilford's decision to recuse himself from the 2009 and 2012 cases. The court then adjourned the hearing, and vacated the trial date until the recusal motion had been resolved.

Turner's recusal motion was referred to Judge Tucker, who denied the motion.[4] At the next hearing on July 25, the court set trial to begin on July 30. In a closed hearing with Turner and Harley, outside the presence of the government attorney, the court stated that it was prepared to appoint Harley as counsel for Turner. Turner reiterated his concern about any attorney from the Southern Division CJA panel, and stated he wanted to interview two or three people on the CJA panel in Los Angeles and pick someone, preferably female, with whom he felt comfortable. The court again rejected these concerns. Still in the closed hearing, the court stated that if Turner did not want Harley, "we will proceed to trial, and you will represent yourself, and I will find that you have made a knowing, intelligent, and voluntary waiver of your right to counsel." Turner stated, "I will go ahead and proceed myself," though he reiterated he wanted counsel

---

[4] Turner's subsequent motion for reconsideration was also denied, and Turner filed an interlocutory appeal of the denial.

from Los Angeles.  Back in open court, the court stated that
Harley was "a competent, experienced criminal practitioner
and has the ability and intent if allowed to do so to fully,
fairly, and zealously represent Mr. Turner."   The court
concluded that Turner had waived his right to counsel by
refusing to accept Harley, "competent, conflict-free counsel,"
as appointed counsel.  Nevertheless, the court stated that if
Turner changed his mind about having Harley represent him,
Turner could notify the court no later than July 26.  Turner's
oral motion for another continuance of the trial was denied.

Turner proceeded to trial in the 2012 case pro se.  On July
30, before jury selection, Turner made numerous oral and
written motions asking for a range of relief, including a
request for funds to pay for "a competency hearing for both
medical and mental evaluation."  The court held a hearing on
this motion and denied it as untimely.  With respect to the
motion for funds for a competency hearing, the court stated
it found "that Mr. Turner is competent, that he understands
the issues in this case and that he has the ability to assist in
and conduct his own defense."  The court cited two examples
in the record.  The day before, Turner had been able to
"intelligently participate in the voir dire process" which
"required assimilation of information from about 24 different
people."  The court noted that Turner had assimilated that
information and was able to make strategic decisions in
making peremptory challenges.  Second, the court noted that
his oral arguments in support of his motions for appointment
of an investigator and paralegal reflected his ability to
"understand the basic concepts" and present information in "a
logical and organized fashion."  The court concluded that
Turner was competent to conduct his own defense based on
the court's own observations and information it had obtained
from MDC.

On August 1, Turner requested immediate medical attention for lower back pain. In an abundance of caution, the court issued a minute order directing the MDC to "ensure that Turner receives all necessary medical care while in the custody of the Bureau of Prisons." The court informed Turner that the issuance of the order "in no way detracts from" the finding that he was mentally and medically fit to proceed to trial.

On August 2, after the jury was brought in following the lunch recess, Turner directed two questions to Eric Homa, but then reported that he was "in some major pain" and did not have his attention deficit hyperactivity disorder medication. The court concluded the proceedings early.

On August 6, Turner again complained that he needed medication, that he was nauseated and vomiting, and that he had requested to see a doctor at MDC over the weekend and that morning. After admitting he had, in fact, been seen by medical staff at MDC and given some medications that morning, he insisted he wanted "to see an outside doctor." The court asked MDC to provide a medical report for Turner, and concluded proceedings for the day.

On August 7, Turner filed another motion to stay the proceedings based on the failure of the U.S. Marshals service to approve medical specialists to visit him. He complained that he was not receiving his antibiotics, steroids, or shots and that he had seen a nurse technician, not a doctor, the day before. The court denied Turner's motion. With regard to Turner's medical condition, the court stated it had spoken to MDC medical personnel three times on August 6 and was "advised that Mr. Turner was okay" and that all necessary tests and medications had been administered. MDC

personnel also informed the court there was "no physical reason why [Turner] couldn't come to trial." The marshals reported that Turner had proceeded through the pill line (where medications were administered to inmates at MDC) that morning and had been given the two medications Turner stated he had not received, but "[f]or some reason [Turner] did not take them." The court concluded that this was a delay tactic but asked for the medications to be brought to court so Turner could take them.

On August 8, Turner told the court that he was given a double dose of his medication that morning. He also stated that he wanted to "file criminal charges against the police" because the day before they had lifted him out of his wheelchair and pushed him against the wall, causing pain. He also complained of laryngitis, high blood pressure, and an abnormal heart rate. After a recess, the court stated that the marshals had a videotape of the incident and that the court had reviewed it along with Harley and the government counsel. According to the court, the video showed that the sheriffs asked Turner to stand so they could complete the physical search. Turner rose and "then just slip[ped] to the ground on his knees." According to the court, "[a]t no time in my observation was any force applied to him in that process." The court concluded that "I do not believe that Mr. Turner accurately described the incident."[5]

The court also noted that he had spoken to a member of the MDC medical staff and a general practitioner who had

---

[5] The court subsequently stated on the record that Turner "appeared of his own volition to slip out of the wheelchair and go down to his knees. . . . I believe that his version of that was wholly fabricated, and thus I am very skeptical of it."

been treating Turner and that both had stated that Turner was acting as if he were in pain but there were no visible signs of injury. Turner had been prescribed a pain reliever and also received normal dosages of his usual medications. When his blood pressure was taken, MDC staff observed that Turner was holding his breath to increase his blood pressure.

Relating its own observations of Turner's behavior in court that day, the court noted that Turner was acting drowsy, "as if he were semi-comatose," but that Turner's doctor stated that the medications Turner had taken would not cause such symptoms. Based on the medical information, the court concluded that "there is no basis for any symptoms of drowsiness, lack of alertness, or being semi-comatose." After recounting the report from MDC at length, the court stated to Turner: "The conclusion I draw based on the report from the MDC to me this morning is that you are malingering."

Despite the court's finding, Turner requested to go to the hospital seven times over the course of the day, and interrupted the government's direct examination to state that he was in pain. The court denied the initial requests because there was nothing suggesting a trip to the hospital was medically necessary. Although he claimed to need medical attention, Turner proceeded with cross-examination of the first witness, Lynn Carol Moseman-Richardson, a friend of the Homas and an investor in the Gorilla Back. Turner commenced a line of questions aimed at developing evidence that Turner had not attempted to defraud the investors but had in fact engaged in manufacturing the Gorilla Back. For example:

> Q: Did you ever meet Mr. Turner or did he
> ever solicit you in any fashion?

. . .

A: No, I never met Mr. Turner.

Q: Do you know if any manufacturing was
done on this product?

. . .

A: I know some samples were made, so I
would say they were manufactured.

Q: Do you know that thousands were
manufactured and there were some pictures
shown to the person who contacted you?

. . .

A: I am not under the understanding that there
were thousands made.    I am under the
impression there was probably less than a
hundred made.

Turner engaged in the same line of questioning with the
next witness, Pamela Jolly, the mother-in-law of Eric Homa,
who loaned money to the company.  He referenced Jolly's
testimony on direct examination and referred to specific
exhibits:

Q: Do you know if the Gorilla Backs were
indeed manufactured?

A: I think maybe about ten of them were
made.

Q: Were any photos ever sent to you by Amber or Eric of the manufacturing plant?

A: No.

MR. HARLEY: Your Honor, he's referring to defendant's 200, page 23.

. . .

Q: Does the photo reflect nine molds and more than ten samples?

A: Yes, there's more than ten there. There may be about 20.

Similarly, on recross-examination of Eric Homa, Turner asked a series of coherent and relevant questions. Only in one portion of the recross did Turner appear confused. Turner referred to Eric Homa's "daughter" and "husband," apparently meaning Homa's wife, and asked several questions that seemed nonsensical, such as "Do you know if your daughter fabricated or Mr. Homa with a 2009 alleged victim?" But this confusion extended for only a few questions, and after conferring with Harley, Turner shifted to a relevant line of questions aimed at eliciting testimony that various buyers had placed orders for the Gorilla Back. For example, Turner asked Homa whether he was aware of orders being presented to Homa and his attorney:

Q: If Mr. Turner wanted to get more money, was any more orders, closed orders, presented to [Homa's] attorney?

A: There was no specific orders.  Mr. Turner mentioned numerous orders that may be available in the future, but nothing specific.

Q: Was one of those Ace Hardware store?

A: Yes.

Q: Did you actually speak on a conference call with the connection with Ace Hardware and Mr. Turner?

. . .

A: I spoke with an individual stating he was from Ace Hardware.  I never saw any credentials or knew if that person actually was from Ace Hardware.

After the lunch break on August 8, Turner was taken to the Western Medical Center to be treated for high blood pressure.

On August 9, Turner returned to trial and moved the district court to "dismiss everything that was done yesterday." He also moved for a stay so that he would "have time to heal from a diagnosis of bronchitis and laryngitis by the folks at MDC; to see a heart doctor" and "understand every drug that's in [his] system through [his] blood work." Turner continued: "[t]he nurses were very peculiar about what was going on" and requested "to go to the hospital and be blood-tested." He also asked for the marshals who took him to the hospital the day before to be sanctioned because he believed they had prevented the emergency room doctor from doing

certain tests. He asked that the doctor be subpoenaed so the doctor could testify about the doctor's interactions with the marshals.

The court denied the motion. The report from the emergency room doctor who treated Turner stated that his blood pressure was normal, he was receiving adequate treatment at MDC, and there were "no additional medical treatment necessary at this point based on his appearance, history, and examination." Based on this report, the court concluded that the trial could proceed. The court also warned Turner not to "curry inappropriate sympathy by referring to your medical condition in front of the jury."

Turner returned to the cross-examination of Pamela Jolly. Contrary to the court's instruction, Turner complained about his medical condition during this cross-examination. In response to Turner's references, the court informed the jury that nothing was wrong with Turner and that he had been cleared to proceed. Turner again discussed his medical condition, stating that the marshals had prevented the doctor from doing x-rays and blood work. The court repeatedly instructed Turner to stay on topic, but Turner insisted upon discussing his medical issues until the court called for a recess and excused the jury.

During the recess, Turner again reiterated his complaints about the marshals preventing the emergency room doctor from conducting x-rays and blood tests. The court instructed Turner that his complaints were already on the record and that the proceedings would continue after the recess. During the recess, the court made a number of findings, including that Turner had "no credibility with [the court] with regard to the self-reporting of any incident that he's involved in, including

self-reporting of his physical condition." After proceedings resumed, Turner, for a fourth time, demanded x-rays and blood work. Turner refused to leave this topic despite further admonitions by the court, and the court ended proceedings for the day.

On August 13, Turner moved for a mistrial, stating that he was too ill at trial to understand the proceedings and adequately represent himself. In support of this motion, he stated that he did not recall any of the events of August 8: "I don't recall that meeting or that day, from what people were stating that I was actually even crossing the wrong witness. I don't even remember which witnesses were on there." He later added: "There were several occasions where I presume I was cut off because I was taking so long. I couldn't breathe very well. I couldn't also speak. My throat was swollen. And so the time that it took to cross-examine took longer because of the illness and the excruciating pain that was in my back." He further stated that "MDC just point blank falsif[ied] records, medical records" because he had not seen a doctor for his bronchitis, though he acknowledged that a physician's assistant at the jail had looked at his throat. He questioned MDC's assessment that "he was cleared to go to trial when he has several medications, 11 to 12 to 15 medications" that he was taking daily because there was no way MDC could assess his health without input from a specialist.

The court denied the motion, citing reports from MDC that Turner's physical health was not an issue. The court also noted that Turner had sufficient time to engage in cross-examination of witnesses that were on the stand on August 8: "In each instance you went twice or almost twice the time of

direct." He also had other opportunities to examine Homa on August 2 and Jolly on August 9.

On August 15, a jury returned a guilty verdict on all counts, including the sentencing enhancement.

*2009 case.* On May 12, 2014, the court sentenced Turner to a term of 87 months plus three years supervised release in the 2009 case and ordered him to pay restitution in the amount of $1,563,577.

*2012 case.* On February 26, 2015, court sentenced Turner to 115 months in the 2012 case, to run consecutively with his 87 month sentence in the 2009 case, and was ordered to pay $229,500 in restitution.

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

## II

We now turn to Turner's claims on appeal.

## A

*2009 case.* We first consider Turner's argument that his Sixth Amendment right to counsel of choice was violated in the 2009 case when the district court rejected Houman Fakhimi's request for a continuance until late November or December 2012. Taking into account the government attorney's pregnancy and due date, the court agreed to a continuance only to October 9. Turner argues that this ruling constructively denied Turner his right to counsel of choice because it led Fakhimi to withdraw his substitution request.

We have held that where a request for a continuance implicates the right to counsel, the district court's denial of such a request "can be analyzed either as the denial of a continuance or as the denial of a motion to substitute counsel." *United States v. Nguyen*, 262 F.3d 998, 1001 (9th Cir. 2001). "A [d]istrict [c]ourt's primary reasons for not allowing a defendant new counsel may determine which analysis to apply." *Id.* at 1001–02; *see also United States v. Thompson*, 587 F.3d 1165, 1173 (9th Cir. 2009). Here, the district court's ruling was based on timing concerns. After noting that the court had been "extremely patient" with Turner over the course of the proceedings "with the simple goal" of getting to trial, the court agreed to continue the September 25 trial date, but only until October 9. Given this focus, we analyze the district court's order as denial of the full continuance requested. *See Thompson*, 587 F.3d at 1173–74 (analyzing a defendant's request as a denial of a continuance where "the district court stated multiple times that it was denying [the defendant's] 'request for a continuance'" even where the effect of the denial was to deny a request for counsel.).

We review the denial of a motion for a continuance for abuse of discretion. *United States v. Kloehn*, 620 F.3d 1122, 1126–27 (9th Cir. 2010). "To establish a Sixth Amendment violation based on the denial of a motion to continue, [a defendant] must show that the trial court abused its discretion through an 'unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay."'" *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)). Where a denial of a continuance implicates a defendant's Sixth Amendment right to counsel, we consider the following factors: "(1) whether the continuance would inconvenience

witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would prejudice the defendant." *Thompson*, 587 F.3d at 1174 (quoting *United States v. Studley*, 783 F.2d 934, 938 (9th Cir. 1986)).

Here, an analysis of the five factors supports the district court's denial of a longer continuance. Beginning with the first factor, an additional continuance would have inconvenienced the court and the government, given the government prosecutor's due date, and the court's "extremely busy" calendar during the following months.

Second, seven other continuances had been granted, delaying the trial from February 9, 2010 to September 25, 2012.

Turning to the third factor, there was no legitimate reason for delay. Turner cited a breakdown in communication with Steward, and under some circumstances such a breakdown can necessitate a continuance. A defendant may not be "forced into a trial with the assistance of a particular lawyer with whom he [is] dissatisfied, with whom he [will] not cooperate, and with whom he [will] not, in any manner whatsoever, communicate." *Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970). But here there was no evidence that the relationship between Turner and Steward had irretrievably broken down in such a manner. As an initial matter, Turner agreed to proceed to trial with *either* Steward or Fakhimi, and did not suggest he could not communicate with Steward. Although he had asked to represent himself in the 2012 case a month earlier, he stated it was not because of

problems with Steward, and that he intended to continue to retain Steward for the 2009 case.

As to the fourth factor, the district court could reasonably conclude that Turner was at fault for the delays. The majority of the seven continuances had been at Turner's request, and the court previously made a finding that Turner was "purposefully delaying this case."

Finally, as to the fifth factor, Turner was not prejudiced by proceeding to trial with Steward, competent counsel with whom he had no irreconcilable conflict.

Accordingly, we conclude that the district court did not abuse its discretion in denying the request for a lengthier continuance.

## B

*2012 case.* We now consider Turner's claim that he did not validly waive his right to counsel in the 2012 case. We review the validity of a waiver of a constitutional right de novo. *Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc).

The Sixth Amendment guarantees "that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." *Faretta*, 422 U.S. at 807. It also guarantees a criminal defendant the "constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." *Id*. A court may not "thrust counsel upon the accused, against his considered wish." *Id*. at 820. Accordingly, a defendant "has two correlative and

mutually exclusive Sixth Amendment rights: the right to have counsel, on one hand, and the right to refuse counsel and represent himself, on the other," and can waive either right so long as the waiver is knowing and intelligent. *United States v. Gerritsen*, 571 F.3d 1001, 1007 (9th Cir. 2009). In order to constitute a knowing and intelligent waiver of the right to counsel, the defendant must be aware of "(1) the nature of the charges against him; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *United States v. Farhad*, 190 F.3d 1097, 1099 (9th Cir. 1999) (per curiam) (quoting *United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir. 1987)).

A defendant can waive either of the correlative Sixth Amendment rights by conduct. For example, a defendant can waive the right to proceed pro se by inviting or agreeing "to any substantial participation by counsel." *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984). Likewise, a defendant may waive the right to counsel by engaging in conduct that is "dilatory and hinders the efficient administration of justice." *Thompson*, 587 F.3d at 1174 (quoting *United States v. Meeks*, 987 F.2d 575, 579 (9th Cir. 1993)); *see also United States v. Mesquiti*, 854 F.3d 267, 272 (5th Cir. 2017) ("A defendant can waive his right to counsel implicitly, by his clear conduct, as well as by his express statement."); *United States v. Oreye*, 263 F.3d 669, 670 (7th Cir. 2001) (same). In *United States v. Sutcliffe*, for instance, a defendant had "manipulated the proceedings and his relationships with five appointed lawyers so as to be able to claim that he wants to be represented by counsel while at the same time making it impossible for any competent lawyer to carry out his professional responsibilities." 505 F.3d 944, 955 (9th Cir. 2007). We

concluded that in light of the defendant's manipulative behavior, "the district court did not err in finding that Defendant knowingly and intelligently waived his right to counsel through his conduct." *Id.* at 956; *see also United States v. Kneeland*, 148 F.3d 6, 12 (1st Cir. 1998) (holding that defendant waived his right to counsel "not because he ever stated, in so many words, that he did not want attorney representation," but because he demonstrated waiver by conduct in dismissing several court-appointed attorneys).

In determining whether a defendant has made a knowing and intelligent waiver of the right to counsel by conduct, we consider whether the defendant was advised of the charges against him and the penalties he may face, *see Sutcliffe*, 505 F.3d at 955; *Richardson v. Lucas*, 741 F.2d 753, 756–57 (5th Cir. 1984), and whether "a fair reading of the record as a whole" indicates that the defendant "understood the dangers and disadvantages of self-representation," *United States v. Kelm*, 827 F.2d 1319, 1322 (9th Cir. 1987), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc); *cf. Meeks*, 987 F.2d at 579 (holding that the district court erred in finding the defendant had waived his right to counsel by conduct because "[t]he court did not make Meeks aware of the dangers of proceeding pro se, nor does the record indicate that he knew of them")*.* Even where a defendant continues to insist on being represented by counsel, a court may conclude that the defendant has waived the right to counsel by refusing to accept the competent counsel that has been offered. For instance, where a defendant has rejected several competent attorneys, it is "entirely proper for the trial court to require [the defendant] to choose between proceeding to trial with his present attorney and representing himself." *Kneeland*, 148 F.3d at 11; s*ee also United States v. Moore*, 706 F.2d 538, 540 (5th

Cir. 1983) (holding that a defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel" is "the functional equivalent of a knowing and voluntary waiver of counsel").  The inference that the defendant has knowingly and intelligently waived the right to counsel by conduct is strengthened when the defendant has been warned that further dilatory behavior, including failure to obtain counsel or cooperate with current counsel, could lead to waiver, *see United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir. 1989), or when the court had given the defendant multiple opportunities to secure counsel, *see United States v. Gates*, 557 F.2d 1086, 1088 (5th Cir. 1977); *see also Kelm*, 827 F.2d at 1322 ("[A] court must be wary against the 'right of counsel' being used as a ploy to gain time or effect delay.").

In sum, if the record as a whole establishes that the defendant had sufficient information about the charges, penalties, and risks and disadvantages of proceeding pro se, and sufficient opportunity to be represented by counsel, a "defendant's actions which have the effect of depriving himself of appointed counsel will establish a knowing and intentional choice." *Fazzini*, 871 F.2d at 642.

In this case, the district court did not err in concluding that Turner waived his right to counsel through his conduct. The record supports the district court's conclusion that Turner was engaging in dilatory tactics, rather than attempting to exercise his right to counsel in good faith.  To recap, Turner asserted his right to represent himself four times and subsequently asserted his right to counsel, but only counsel of his choice.  After the court denied his request to represent himself on July 30, 2012, Turner moved again to represent himself on August 12, but then changed his mind and stated

on August 27 that he would try to retain an attorney. Turner moved to represent himself again on October 18, 2012 and confirmed his desire to represent himself at an April 17, 2013 status conference. A July 16, 2013 trial date was set. At a status conference on May 6, Turner asked for a 30-day continuance to attempt to retain counsel. At a hearing on June 10, Turner stated he was continuing his efforts to retain counsel. He repeated this same refrain on June 25 and on July 10. On July 19, he vacillated as to whether he would accept appointed counsel, but ultimately asked the court to appoint counsel. On July 22, Turner stated he wanted to retain counsel and refused to accept Harley as appointed counsel.

As this recital makes clear, Turner "manipulated the proceedings" by vacillating between asserting his right to self representation and his right to counsel. *Sutcliffe*, 505 F.3d at 955. The district court concluded as much, telling Turner on July 10 that it was "unfair to the court system and unfair to the government to engage in the pattern which I'll charitably call dalliance, shuttling between being represented by yourself and by counsel." The district court did not abuse its discretion in concluding that Turner was taking these steps for purposes of delay.

The district court was conscientious in its efforts leading up to the waiver. Turner had previously been provided with the information necessary for a knowing and intelligent waiver; he had been informed of the risks and consequences of proceeding pro se at the October 18, 2012 hearing, and was given the correct information about the charges against him and the possible penalties at the July 10, 2013 hearing. *See id.*; *Kneeland*, 148 F.3d at 11; *Kelm*, 827 F.2d at 1322. Further, the district court informed Turner that his behavior

put him at risk of waiving his right to counsel.  On July 10, 2013, the court told him that if he failed to obtain counsel by July 12, he would have to represent himself, and that trial would start July 18.  At the July 19 hearing, the court warned Turner that it was considering whether to appoint another counsel or require Turner to proceed pro se in view of the delays.  And again, before requiring Turner to proceed pro se, the court warned Turner that if he rejected the appointment of Harley, Turner would be deemed to have made a knowing, intelligent and voluntary waiver of his right to counsel.  In an abundance of caution, the court also stated that Turner could notify the court by July 26 if he changed his mind and wanted Harley to represent him.  Turner did not do so.

Turner therefore had sufficient information about proceeding pro se and sufficient opportunity to be afforded the assistance of counsel.  The court could reasonably conclude that Turner's obstructionist behavior and refusal to accept counsel despite repeated opportunities established that he was effectively waiving his right to counsel.  In light of Turner's repeated manipulative behavior, "we are satisfied that the district court did not err in finding that Defendant knowingly and intelligently waived his right to counsel through his conduct."  *Sutcliffe*, 505 F.3d at 956.[6]

---

[6] We reject Turner's argument that he had a conflict with Harley. Turner's claim that Harley divulged information to the prosecution and that all counsel on the CJA panel in the Southern Division were conflicted is meritless and the district court properly concluded that Harley was "a competent, experienced criminal practitioner" who was conflict-free.

III

We now turn to a number of claims that hinge on Turner's mental and physical health during the trials and related proceedings. Although Turner raises a panoply of issues, they cohere around two principal arguments. First, Turner argues that the district court erred in both the 2009 and the 2012 trials by not authorizing CJA funds to hire a psychiatrist to conduct an independent medical evaluation. Second, Turner argues that there was a serious question regarding his competence to represent himself in the 2012 trial. According to Turner, the court erred in failing to continue the 2012 trial to conduct an evidentiary hearing regarding Turner's competence to proceed to trial and to represent himself, in failing to grant a mistrial, and in failing to terminate his self-representation.

In considering Turner's arguments, we are mindful that in general, the district court is in the best position to evaluate claims of physical and mental illness impacting the defendant at trial. District courts have been given "a relatively wide berth" in evaluating the effect of a defendant's mental or physical complaints in light of the court's "firsthand knowledge of the defendant and his situation, gained over time," and the ability to "sift overstatement from understatement, eyeing the defendant's and the doctors' credibility, and tempering the prosecutors' zeal." *United States v. Zannino*, 895 F.2d 1, 13 (1st Cir. 1990); *see also United States v. Brown*, 821 F.2d 986, 989 (4th Cir. 1987) ("It was entirely proper, of course, for the court to consider its observations of the defendant's activity and alertness in ascertaining his physical and mental capabilities."). We review the district court's factual findings about a defendant's competence for clear error. *See United States v. Friedman*,

366 F.3d 975, 980 (9th Cir. 2004).  A defendant's claims of impairment must be considered in the context of the trial as a whole.  *Battaglia v. United States*, 428 F.2d 957, 958–59 (9th Cir. 1970).

## A

We first consider Turner's claim that the district court erred by failing to approve funds to hire a physician to conduct an independent mental evaluation in the 2009 trial.[7] After the conclusion of the guilt phase of the trial, Turner sought expert assistance for two purposes.  First, he intended to move for a new trial on the mail and wire fraud convictions, and claimed an expert's evidence regarding his mental impairments would support a claim that he had lacked specific intent to defraud.  Second, Turner sought mitigation evidence for the sentencing hearing.

The Criminal Justice Act provides that a person "who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application" and the court, "[u]pon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary," may authorize funding for

---

[7] Turner raised similar arguments regarding the court's denial of his request for a psychiatric evaluation with respect to the 2012 case.  In that case, however, Turner made a motion for funds for a physical and mental evaluation on the day of jury selection, and the district court did not abuse its discretion in denying the motion as untimely.  *See United States v. Valtierra*, 467 F.2d 125, 126 (9th Cir. 1972) (upholding the district court's denial of a request for CJA funds for a psychiatric evaluation filed on the day trial was set to begin in part because it was untimely).

such expert services.   18 U.S.C. § 3006A(e)(1).**8**   "The purpose of the Criminal Justice Act [is] to put indigent defendants as nearly as possible in the same position as nonindigent defendants."   *United States v. Pete*, 819 F.3d 1121, 1130 (9th Cir. 2016) (alteration in original) (quoting *United States v. Sanders*, 459 F.2d 1001, 1002 (9th Cir. 1972)).   Therefore, it is an abuse of discretion to deny a request for an expert where "(1) 'reasonably competent counsel would have required the assistance of the requested expert for a paying client,' and (2) the defendant 'was prejudiced by lack of expert assistance.'"   *United States v. Rodriguez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005) (quoting *United States v. Nelson*, 137 F.3d 1094, 1101 n.2 (9th Cir. 1998)), *overruled on other grounds by United States v. Hernandez-Estrada*, 749 F.3d 1154 (9th Cir. 2014) (en banc).**9**   Prejudice "cannot be merely speculative; it must be

---

**8** 18 U.S.C. § 3006A(e)(1) provides in full:

> Upon request.  Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application.   Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court . . . shall authorize counsel to obtain the services.

**9** In *Ayestas v. Davis*, 138 S. Ct. 1080 (2018), the Supreme Court considered a related statute, 18 U.S.C. § 3599(f), which makes funds available for "investigative, expert, or other services . . . reasonably necessary for the representation" of a capital defendant.   18 U.S.C. § 3599(f).  *Ayestas* rejected the Fifth Circuit's rule that investigative services were not "reasonably necessary" unless the applicant could show a substantial need for those services, and held that courts should consider the usefulness of the proposed services in light of "the potential merit of the claims that the applicant wants to pursue, the likelihood that the

demonstrated by clear and convincing evidence." *United States v. Chase*, 499 F.3d 1061, 1068 (9th Cir. 2007). A defendant's "claim that an expert should have been appointed must be evaluated in the context of the underlying claims for which he asserts he ought to have been given expert help." *Rodriguez-Lara*, 421 F.3d at 940.

Applying these principles, the district court did not abuse its discretion in denying Turner's request for an expert to perform a mental evaluation in support of a motion for a new trial. Turner claims that such a mental evaluation could provide the basis for a diminished capacity defense to the mail and wire fraud charges. But a psychological evaluation of a defendant at the time of trial is "minimally probative" of the defendant's mental capacity at the time of an offense that took place years earlier. *Griffin v. Johnson*, 350 F.3d 956, 965 (9th Cir. 2003) (psychiatric evaluation conducted eight years after a murder had minimal probative value). Here, a psychological evaluation in 2013 would provide minimal insight into Turner's mental state in 2005 and 2006, when the offense conduct occurred.

Nor did the district court abuse its discretion in concluding that there was no need for expert assistance to prepare for sentencing. Turner's alleged physical and mental

---

services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in the way." *Ayestas*, 138 S. Ct. at 1094. The Court clarified, however, that the statute does not "guarantee that an applicant will have enough money to turn over every stone." *Id.* Although *Ayestas* is not directly on point because § 3006A(e)(1) uses the term "necessary," rather than "reasonably necessary" as in § 3599(f), its holding is consistent with our long-standing rule that a court must consider the utility of the requested service under all of the circumstances. *See Rodriguez-Lara*, 421 F.3d at 940.

impairments were set forth in detail in the presentence report prepared by the probation office and the district court properly considered them as mitigating evidence during sentencing.    The district court concluded that Turner's physical and mental condition did not warrant a sentence reduction because Turner had been "able to carry out a relatively complicated fraud" and "none of these factors caused the fraud or diminished his responsibility for the fraud."  Because Turner failed to demonstrate by clear and convincing evidence that he was prejudiced by the absence of a new physical and mental evaluation, the district court's denial of the fund request in the 2009 trial was not an abuse of discretion.

B

We next turn to Turner's claim that the court erred in failing to continue the 2012 trial to conduct a sua sponte evidentiary hearing regarding Turner's competence both to stand trial and to represent himself.  We review a court's failure to sua sponte hold a competency hearing for plain error.  *United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013).  "Failing to sua sponte hold a competency hearing is plain error only if 'the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence.'" *United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (quoting *Dreyer*, 705 F.3d at 961).  In order to give rise to such a genuine doubt, "[a] defendant must present 'strong' medical evidence of a serious mental disease or defect" and establish "a causal connection between the mental disease or defect and his inability to understand the proceedings." *United States v. Neal*, 776 F.3d 645, 655–56 (9th Cir. 2015) (quoting *Garza*, 751 F.3d at 1135).  "Even a mentally

deranged defendant is out of luck if there is no indication that he failed to understand or assist in his criminal proceedings." *Garza*, 751 F.3d at 1136. "And even if that same defendant did fail to understand or assist in his proceedings, he would still be out of luck unless his mental impairment caused the failure." *Id.* We apply the same standard to determine whether a court plainly erred in failing to sua sponte hold a hearing on a defendant's competence for self-representation. While a district court may, at its discretion, "require a higher level of competence for self-representation" than for fitness to stand trial, *Thompson*, 587 F.3d at 1172 (citing *Indiana v. Edwards*, 554 U.S. 164 (2008)), it is not required to do so, *see United States v. Ferguson*, 560 F.3d 1060, 1070 n.6 (9th Cir. 2009) ("*Edwards* does not *compel* a trial court to deny a defendant the exercise of his or her right to self-representation; it simply *permits* a trial court to require representation for a defendant who lacks mental competency to conduct trial proceedings.").

The record here lacks substantial evidence that would lead a reasonable judge to harbor a genuine doubt about Turner's competence. Turner's evidence of mental issues was limited to evidence of a diagnosis of attention deficit disorder and attention deficit hyperactivity disorder. Beyond this, Turner engaged in a litany of complaints regarding his physical and mental condition as well as bizarre and obstructionist behavior that the court ultimately determined was for the purpose of delay or was malingering. These findings are not clearly erroneous given the ample support in the record. Although Turner was occasionally disruptive, "rude, uncooperative and sometimes wacky behavior" does not raise a serious doubt about competency. *Neal*, 776 F.3d at 657.

By contrast, nothing in the record suggests that Turner was unable to represent himself or understand the proceedings. Turner was able "to carry out the basic tasks needed to present his own defense without the help of counsel." *Thompson*, 587 F.3d at 1172 (quoting *Ferguson*, 560 F.3d at 1068). Turner made an opening statement, participated in voir dire, examined and cross-examined witnesses, and made logical arguments in support of various motions. When a defendant was "responsive and rational at trial and participated effectively when he chose to do so," *Neal*, 776 F.3d at 657, as Turner was here, there is no need for a sua sponte competency hearing.[10]

Turner focuses in particular on the events of August 8, claiming there was evidence that his many physical impairments affected his ability to understand the trial, including his complaints of pain, his drowsy and semi-comatose appearance, his confusion in cross-examining Eric Homa, and his subsequent removal to the Western Medical Center to treat him for high blood pressure. We disagree. Based on the totality of the circumstances, the court's finding that Turner was malingering during the proceedings on August 8 is not clearly erroneous. Indeed, Western Medical Center determined that Turner's blood pressure was normal and that no additional medical treatment was necessary. Moreover, Turner was able to proceed with a coherent line of cross-examination of several witnesses. Although Turner showed momentary confusion in his cross-examination of Eric Homa, he was able to recover after discussions with his

---

[10] Because the district court did not plainly err in failing to hold a sua sponte competency hearing, it did not abuse its discretion in failing to continue the trial to hold such a hearing.

standby counsel and engage in reasonable questioning of Homa and other witnesses.[11]

For the same reasons, the court did not abuse its discretion in denying Turner's motion for a mistrial at the conclusion of the 2012 trial due to his mental and physical impairments. Because a reasonable judge would not have found it necessary to doubt Turner's competency, there was no "error" here that "would make reversal on appeal a certainty." *United States v. Elliot*, 463 F.3d 858, 864 (9th Cir. 2006) (quoting *Illinois v. Somerville*, 410 U.S. 458, 464 (1973)).

IV

We conclude that the district court did not violate Turner's Sixth Amendment rights in granting a shorter continuance in the 2009 trial nor in concluding that Turner had waived his right to counsel by conduct in the 2012 trial. We further conclude that the court did not abuse its discretion in determining that Turner was not entitled to CJA funds in either trial. Nor did the court err in failing to hold a sua sponte competency hearing in the 2012 trial. Because a reasonable court would not doubt Turner's competency, we also affirm the court's denial of the motion for mistrial and its decision not to terminate Turner's self-representation.

**AFFIRMED.**

---

[11] Given that no reasonable judge would harbor genuine doubt about Turner's competency, either before the events of August 8 or after, we reject Turner's argument that the court was obligated to terminate Turner's self-representation.